GENERAL BUILDERS SUPPLY CO., INC. *v.* MacARTHUR

[No. 223, September Term, 1961.]

322

Decided *April 16, 1962.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT, HORNEY and SYBERT, JJ.

Submitted on brief by *Kardy & Brannan, William J. Brannan, Jr.,* and *John K. Gearing,* for appellant.

*John P. Moore,* with whom was *William D. Paton* on the brief, for appellee.

HORNEY, J., delivered the opinion of the Court.

In an action brought by an owner against the builder as principal and the surety on a performance bond for the construction of a dwelling, the Circuit Court for Montgomery County entered a judgment against the surety as well as the builder (though in varying amounts) and the surety appealed.

In October of 1959 Bruce M. MacArthur (the owner) entered into a memorandum agreement with the Construction and Development Corporation of Maryland (the builder or principal) under which the builder proposed to construct a dwelling for $29,431, and the owner made a deposit on account of $1,000. Subsequently, before the construction contract was executed, the builder suggested that a "precut house" be purchased from the Hog Island Lumber Company (Hilco) at a cost of $10,000. The owner adopted the suggestion and paid the builder another $2,500 on account for the precut lumber.

The construction contract, to which the plans and specifications were attached, was executed in February of 1960. Between October and February the owner had paid to the builder an additional sum of $931, or a total of $4,431, on account of the contract price. And, when the construction contract had

been signed, the owner went beyond the requirements of the contract and sent a check direct to Hilco for $7,500, at the request of the builder, for the balance due on the lumber. But almost immediately thereafter the owner, having become concerned about the ability of the builder to meet its obligations for labor and materials, stopped payment on the check and demanded a performance bond to assure compliance with the construction contract.

In the area in which the dwelling was under construction, the General Builders Supply Company, Inc., had an agency agreement with Hilco whereby it received a commission on the prefabricated houses sold in its territory. On other occasions the agent had become surety on other performance bonds. And, when Hilco was informed of the stop order and demand for bond, it promptly communicated with its agent (sometimes referred to as surety) and arranged for it to become surety on the bond demanded by the owner. The agent, because it was reluctant to be bound for so large a sum, hesitated at first to sign the bond, but when Hilco insisted and intimated that the agent might lose its franchise if it did not go on the bond, the agent as surety executed the bond with the builder as principal and delivered it to the owner. The obligation of the bond was to the effect that if the principal did not perform its contract with the owner, then the surety would "remedy the default" or "complete the contract in accordance with its terms and conditions." Promptly thereafter the owner paid Hilco the balance due of $7,500.

After the signing of the construction contract, sums slightly in excess of the balance of the contract price were deposited from time to time in a joint bank account and all withdrawals therefrom were signed by or on behalf of the owner and builder. But by May of 1960 it became evident that there would not be sufficient funds to complete the house. As of that time the financial status of the builder was such that it could not meet current obligations. And, although $29,598.69 had been expended, there were unpaid bills totaling $7,904.31. At this point the owner refused to make further advances and as a result no further work was done by the builder. The surety was notified of the builder's default, but it denied lia-

bility, and refused to complete the house. And when the surety also defaulted, the owner proceeded to complete the construction of the house. The total cost, including extras costing $2,901, was $46,433.24. And, since the contract price was $29,431, the difference between that price and the actual cost of $43,532.24 was $14,101.24. Judgment was entered against the builder for the difference, but because $4,431 had been paid the builder before the performance bond was executed, a judgment for $9,670.24 was entered against the surety.

Relying primarily on Maryland Rule 828 b, the appellee moved to dismiss the appeal because the record was so inadequate that it would not permit a determination of the questions presented. The appellant's record extract is indeed skimpy, but we think there is enough in the record extract and the appellee's appendix to decide most, if not all, of the questions raised. We therefore deny the motion to dismiss and will dispose of the appeal on its merits insofar as it is possible.

On appeal the surety contends (i) that the performance bond was unenforceable for want of assent; (ii) that the bond was unenforceable for want of consideration; (iii) that it was relieved of liability because the owner breached the contract; and (iv) that the owner failed to prove his claim in accordance with the established rules of evidence.

(i)

The claim here is that the owner cannot enforce the performance bond against the surety because its signature was obtained under such circumstances of business necessity or compulsion as to render the signing involuntary and excuse the surety from liability. The claim is without merit. Even if it is assumed, without deciding, that the execution of the bond was obtained by the exertion of "economic compulsion," the record discloses that such coercion as was used was the act of the agent's own principal and not that of the owner, for the only evidence of coercion on the part of the owner is that he stopped payment of the check for lumber and demanded the execution of a performance bond. There is nothing in the record to show that the owner did anything more than insist

that someone act as surety for the builder: it was Hilco that insisted that its agent become the surety on the bond. And, since there is no claim that the owner was bound to advance the balance due on the lumber or make other advances not required by the terms of the construction contract, it appears that the owner was within his rights when he demanded that he be furnished with a bond assuring performance of the contract by the builder. See *Montauk Corp. v. Seeds,* 215 Md. 491, 501, 138 A. 2d 907 (1958), for a statement of the doctrine of business or economic compulsion.

### (ii)

The next contention is that there was a lack of legal consideration flowing from the owner to the surety for the suretyship agreement which renders the performance bond unenforceable as to the surety. This contention is likewise without merit.

The record shows that the surety undertook the suretyship at the request or insistence of Hilco and that the consideration for the undertaking was a matter between the principal (Hilco) and the agent (General Builders). That the surety was the agent of Hilco is not disputed. And the record shows that the agent, who had acted as surety in previous transactions, undertook to act as surety in this instance in order to forestall the possibility of losing a valuable franchise right. This we think was sufficient consideration to support the suretyship agreement. It was not necessary for the surety to also receive consideration from the owner in order to make the performance bond enforceable as to it. For it is well settled that the consideration supporting a promise "may be given to the promisor or to some other person * * * [and it] may be given by the promisee or by some other person." *Humbird v. Humbird,* 162 Md. 582, 160 Atl. 623 (1932); *Swift v. Allan,* 211 Md. 588, 128 A. 2d 260 (1957). And see *Corbin on Contracts,* §§ 124 and 779, where it is said that a promisee has a right against the promisor even though no consideration moved from the promisee to the promisor. There was sufficient consideration to support the suretyship agreement.

(iii)

The third contention is likewise untenable. The gist of this contention is that the owner breached the construction contract by expending more money than was permitted under the contract. The very purpose of the performance bond was to secure the owner against loss under the contract, and it imposed on the surety "an obligation to pay such damages as are ascertained to result from the default of the contractor, without regard to the specific performance of the contract." *Stearns Law of Suretyship* (5th ed.), § 8.13, p. 272.

The liability of a surety is coextensive with that of the principal, and it is clear that the liability of the surety is measured by the contract of the principal. See *Lange v. Board of Education, use of I. B. M. Corp.*, 183 Md. 255, 37 A. 2d 317 (1944) ; *Trimount Dredging Co., use of Brown & Hooff v. U. S. F. & G. Co.*, 166 Md. 556, 171 Atl. 700 (1934).

While the construction contract and the appended plans and specifications were not included in the record extract, as they probably should have been, there is enough in the record extract and the appendix to show that the owner was to be furnished with a completed dwelling for the sum of money stipulated in the contract. Since there was not substantial compliance with the terms of the contract, the owner had a right to expend such sums as were necessary for completion in accordance with the plans and specifications and, in turn, hold the surety liable for the excess over the contract price. Furthermore, since the terms of the contract, including the plans and specifications, were incorporated in and made a part of the suretyship agreement, it is irrelevant whether the surety or the owner completed the construction as the result would be the same in either event.

(iv)

In this last contention, the surety contends that the admission of cancelled checks into evidence was a violation of the best evidence rule in that the best evidence would have been the original invoices for materials and labor used in completing the construction of the dwelling.

So far as the record extract discloses, the only objection made by the surety to the evidence—introduced to establish

the damages the owner had suffered as a result of the default of the builder—was to the admissibility of an exhibit purporting to be an itemized list (prepared by an auditor under the supervision of the owner) of the cancelled checks given in connection with the completion of the dwelling by the owner. We will therefore consider this objection and no other. But before proceeding to do so, we deem it appropriate to note that there was an abundance of other testimony, by the owner and a contractor he had employed which was not objected to, tending to show that the cost of the labor and materials that went into the completion of the dwelling was fair and reasonable. We return now to the only question raised as to the admissibility of evidence.

The surety, in claiming that the checks were secondary evidence in that they did not explicitly indicate the purpose for which they were given, overlooked the fact that the invoices might not have been any better evidence than the checks on the question of whether the costs were fair and reasonable. It is true that, in a broad sense, the best evidence rule embraces every fact or issue that may be in controversy, but in modern practice the rule is ordinarily invoked where there is an attempt to substitute oral for documentary evidence or where proof is to be made of some fact of which there is a record in writing. 20 Am. Jur., *Evidence*, § 405.

It has been held that secondary evidence may be received when no better evidence is obtainable. Cf. *Marvil Package Co. v. Ginther*, 154 Md. 213, 140 Atl. 95 (1928); *Medley v. Williams*, 7 G. & J. 61, 67 (1835). And where it is not shown by the objecting party that there is a higher grade of available evidence, which, if produced, would more satisfactorily explain and establish a fact than the evidence offered, then the evidence actually produced should not be excluded on the ground that it is secondary evidence. See 32 C.J.S., *Evidence*, § 780; *Billeter v. Halsam Products Co.*, 38 N. E. 2d 994 (Ill. 1942). As we see it, there was no violation of the "best evidence" rule.

For the reasons stated the judgment must be affirmed.

> *Judgment affirmed; the appellant to pay the costs.*