CHELSIE A. LILLER *v.* STATE HIGHWAY
ADMINISTRATION

[No. 613, September Term, 1974.]

*Decided March 17, 1975.*

The cause was argued before ORTH, C. J., and MOYLAN and GILBERT, JJ.

*Horace P. Whitworth, Jr.*, for appellant.

*Paul W. Barnett* and *Charles C. Grice, Special Attorney*, with whom were *Francis B. Burch, Attorney General, Nolan H. Rogers, Special Assistant Attorney General*, State Highway Administration, and *Joseph D. Buscher* on the brief, for appellee.

GILBERT, J., delivered the opinion of the Court.

The State Highway Administration (State) entered into a contract on April 26, 1967 [1] with E.C. Womack, Inc., (Womack) of Virginia Beach, Virginia, for the construction of approximately four miles of Maryland Route 48, more commonly known as the "Cumberland Thruway" or the "National Freeway". Sometime prior to the award of the contract, Womack contacted Chelsie Liller (Liller), an Allegany County land owner, part of whose land was being condemned for the highway. [2] Seemingly in anticipation of being awarded the contract, Womack entered into negotiations with Liller for the dumping of waste material on a part of the Liller property not taken by the State. Liller agreed that in consideration of the payment of the sum of Eighteen Hundred Dollars ($1,800.00) to him, that Womack could dump the waste on a specified ten to thirteen acre tract of the Liller land. The Womack-Liller

---

1. At the time of the entry into the contract by the State the Highway Administration was not then in existence. *See* Laws 1970, Ch. 526, § 1. Therefore, the contract was apparently executed on behalf of the State by the then State Roads Commission, predecessor of the State Highway Administration.

2. It appears from the record that the State proceeded by way of the so-called "quick take" *See* Md. Ann. Code art. 89B, § 9; Real Property Article, § 12-102 and Md. Rule U6. *See also* State Roads Comm'n v. Pumphrey, 260 Md. 633, 273 A. 2d 81 (1971), in which the Court notes the two alternative methods available to the State for acquiring immediate possession.

negotiations reached fruition on April 13, 1967, thirteen days before the award of the construction contract to Womack by the State.[3]

After the designated parcel of the Liller land had been filled by the dumping of the excavated waste material, heavy summer rains caused a landslide. On July 14, 1968, hundreds of tons of rock, silt and debris fell from the eastern slope of Haystack Mountain spilling across U.S. Route 220, as well as across the Baltimore & Ohio Railroad tracks. Both Route 220 and the B. & O. lines were closed until the debris was removed. Other slides, though presumably not of the same intensity, occurred on ten occasions in 1969. In an effort to solve the problem the State, in 1971, constructed a flume in order to divert the highway run-off rainwater away from the waste pile that had been dumped by Womack on the Liller property. Presently, no run-off of rainwater from Md. Route 48 passes over the waste material. Notwithstanding the construction of the flume another slide took place in June, 1972. Route 220 was again closed until the removal of the debris.

The State, in August, 1972, filed a Bill of Complaint for injunctive relief against Liller and Womack,[4] in the Circuit Court for Allegany County. The objective of the suit was to abate a public nuisance, namely, the earth slides falling onto Route 220. The matter was heard before Judge James S. Getty, who, after hearing testimony, the argument of counsel and viewing the property, issued a prohibitory injunction against Liller that forbade Liller's "maintaining the earth and rock storage material . . . in its present state." The court's order also contained a mandatory injunction that commanded Liller "to abate the nuisance by eliminating the danger of earth slides by whatever engineering practices will reasonably assure the stability of the material, whether that involves grading, compacting, terracing, planting or other action. . . ."

---

**3.** Liller argues that Womack formed its contract with the State prior to the Womack-Liller agreement, but the record clearly supports the contrary.

**4.** Womack did not answer the suit. The record reveals that Womack had gone into bankruptcy sometime prior to the institution of the instant case.

Discontented by the trial court's ruling Liller has appealed to this Court where, in a trinal attack, he asserts that:

(1) The trial court erred in not applying laches and equitable estoppel to the facts in this case.

(2) The evidence does not support the findings.

(3) The trial court has not designated with specificity what action Liller should take to eliminate the nuisance.

Liller does not dispute that the earth slides onto U.S. Route 220 are a public nuisance, but he disclaims responsibility for them. That the offending waste pile is a public nuisance is beyond doubt, since it constitutes an injury to the public at large, or all persons with whom it comes in contact. *Adams v. Commissioners of Trappe,* 204 Md. 165, 102 A. 2d 830 (1954). We now turn to the resolution of the issues posed by Liller.

### Laches and Equitable Estoppel

Liller first asseverates that:

"The Doctrine of Equitable Estoppel and Laches should be applied in this case because the State Highway Administration waited four years after completion of the project before objecting to the manner and methods used in establishing the waste pile in the Hollow that their contractor, E.C. Womack, Inc., constructed on Liller's land, knowing during the whole period of dumping of this material by E.C. Womack, Inc., that it was in the path of the drainage channels for surface water from the Freeway as engineered for this whole watershed of 100 acres of land. The State Highway Administration acquiesced in the placing of this material in the Hollow by their own construction company because they had the same inspectors and supervisors on the job and if the material was not being compacted or placed adequately according to their judgment they had the right to object to it at

> the time, if they thought it would interfere with their drainage of surface waters from the Freeway. By waiting four years after completion of the project before making any objection is acquiesce [sic] which is a quasi estoppel and bars the . . . [State's] right to equitable relief as prayed."

This argument must fall because not only is it contrary to law, but is based on facts not supported by the evidence. The testimony of the State's witnesses makes it clear that the dumping of the fill dirt took place entirely on the Liller property. At that time the State was without authority to enter onto Liller's land in order to determine whether the waste was properly compacted or placed; nor could it have directed a different placement or compacting.[5] Womack was an independent contractor, and the presence of State employees upon the highway construction project was obviously to assure that the highway was built in accordance with the State's plans and specifications. The State Highway Administration employees were not on the site to police Womack's activities upon the Liller land. There was no evidence produced by Liller to support his allegation that the State had a duty to see that the waste material was properly dumped, placed and compacted.[6] Moreover, the State was not a party to the Liller-Womack agreement and could not, as the law was then and as Judge Getty noted, "dictate the terms of an agreement to compact waste material on private land."

As far back as *P., W.& B.R.R. Co. v. State,* 20 Md. 157 (1863) the Court of Appeals held, quoting with approval *Mills v. Hall,* 9 Wend. 315 (N.Y. S.Ct. 1832) that, "There is no such thing as a prescriptive right or any other right to maintain a public nuisance. . . ." The holding was repeated in *N.C. Railway Co. v. Baltimore,* 21 Md. 93 (1863) wherein the Court rejected an argument that laches prevented Baltimore

---

5. Since the occurrence of the events giving rise to this case, the law has been changed so that the State now has a duty to intercede when the dumping of waste material will affect the environment. *See* Natural Resources Article, § 1-303 and § 8-1105.

6. *But see* n. 5 *supra.*

City's maintenance of an injunction against the railroad. The Court stated flatly "... *[N]o lapse of time can legalize a public nuisance, or justify a wrongdoer in continuing . . . [the wrong]."* (Emphasis supplied). In other words, laches is not a defense to the enjoining of a public nuisance. *See also Block v. Baltimore,* 149 Md. 39, 129 A. 887 (1925); *Baltimore City v. Fairfield Imp. Co.,* 87 Md. 352, 39 A. 1081 (1898); *Woodyear v. Schaefer,* 57 Md. 1 (1881); *Commonwealth v. Upton,* 6 Gray 473 (Mass. 1856); H. Wood, *The Law of Nuisances,* § 724 (2d ed. 1883); 66 C.J.S. *Nuisances,* § 92 (1950).

Liller's allegation that the State is estopped from proceeding against him is devoid of merit. Liller asserts that if the State had made known its objection to the manner in which the waste was placed upon his property, at the time that it was being placed there, he could have corrected it "at little expense." The State, as we have previously observed, had no authority to enter upon Liller's land, was not a party to the Liller-Womack agreement, and did not exercise supervisory authority over disposition of the waste. Mere silence will not ordinarily raise an estoppel against a party. *Mohr v. Universal C.I.T. Corp.,* 216 Md. 197, 140 A. 2d 49 (1958); *see also Furst v. Carrico,* 167 Md. 465, 175 A. 442 (1934); *Biggs v. Stueler,* 93 Md. 100, 48 A. 727 (1901). When, however, the particular circumstances require a silent party to speak out in order to protect himself against a loss he might not otherwise sustain, "then the party who has remained silent when it was his duty to speak will be estopped from asserting the defense he would have had but for his silence." *Mohr v. Universal C.I.T. Corp., supra* at 205. In the present case there was no more than mere silence on the part of the State employees, and the State was under no duty to speak out and advise Liller relative to the disposal of the waste material. At the expense of redundancy, we repeat that the State had no right to enter upon Liller's property, nor did it then have the right to interfere in any manner with the Liller-Womack contract or relationship.

We, of course, recognize that had the suit been brought before the Womack bankruptcy Liller might have filed a

cross-claim against Womack. Md. Rule 314 b. The record does not, however, indicate when the Womack bankruptcy occurred; but there is an implication that it arose prior to the completion of the construction. In any event, we fail to see how Liller was prejudiced by the State's delay in bringing the injunction suit. The clear inference drawable from the evidence is that the State, at considerable expense, undertook to do all that it possibly could do, short of resorting to litigation, to abate the nuisance. The construction by the State of the flume in 1971, at a cost of $100,000.00, diverted a large volume of rainwater away from the Liller waste mound, and would thus appear to make his correction of the existing peril less costly and involved.

### Sufficiency of the Evidence

Liller contends that it was the State's original channeling of run-off rainwater into his land that caused the slides. Judge Getty, in his opinion, stated:

> " The Court walked the entire site from above and below the dumping storage area. The front of the fill is very steep and along the top and over the crest are cracks, fissures, deep ruts and other openings that corroborate the testimony of the witnesses that excessive rain, freezing and thawing will inevitably result in future slides unless some remedial action is taken.
>
> Liller contends that the diversion of surface water caused the slides. This may partially account for the initial slide in 1968, but cannot be the cause of the 1972 slide, because all surface water has been diverted since the construction of the flume in the spring of 1971. This action by the [S]tate did not eliminate the problem, but eliminated surface water drainage as a contributing factor."

There was evidence that the waste matter rests on a precipitous slope, and that it is "particularly dangerous" because "it crosses two natural swales." Additional

testimony showed that even though the State, as a result of the flume, has diverted water from the waste pile, that one inch of rainfall adds eight million tons of weight to the material. An expert witness for the State said that future slides will occur absent corrective measures, and that such slides could result in not only public inconvenience, but property damage and loss of life.

We think that evidence demonstrating the present perilous condition of the waste pile situate on a steep slope over a State road, together with evidence that the pile has not been properly placed or compacted, and that without corrective measures additional slides will result, is sufficient to support the trial court's finding of the existence of a public nuisance and the granting of an injunction to compel the abatement of that nuisance.

### Specificity of Injunction

Liller attacks the lack of specific direction in the fiat. Liller says:

> " The . . . [decree] did not specifically state what
> . . . [Liller] should do to abate the nuisance, and . . .
> [Liller] has been unable to get any definite plan or
> orders from the State Highway Administration in
> regard to correcting the situation that would be
> within the means of [Liller] . . . ."

In effect we asked to remand and instruct the chancellor to set out some sort of "A,B,C's" of required compliance. Patently, Liller would have preferred the chancellor to specify those things Liller should and should not do. Decrees in nuisance cases that detail those things required to be done and those which should not be done are not the rule, but the exception. *Bishop Processing Co. v. Davis*, 213 Md. 465, 132 A. 2d 445 (1957); *Fox v. Ewers*, 195 Md. 650, 75 A. 2d 357 (1950). Generally, decrees in nuisance cases, "should be passed with only such specific prohibitions as appear to provide the only remedies; . . . the offending party should be permitted to adopt such measures as it sees fit to accomplish

284

the desired result." *Bishop Processing Co. v. Davis, supra* at 475. We think the decree passed by Judge Getty, in the instant case, that Liller cease maintaining the wastepile "in its present state", and take such action as is necessary to "assure the stability of the material" is in keeping with the general rule regarding injunction decrees in nuisance cases. We, thus, conclude that the decree as passed was correct.

*Decree affirmed.*

*Costs to be paid by appellant.*