STATE HIGHWAY ADMINISTRATION *v.*
TRANSAMERICA INSURANCE
COMPANY ET AL.

[No. 76, September Term, 1976.]

*Decided December 8, 1976.*

The cause was argued before SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Paul W. Barnett,* with whom were *Francis B. Burch, Attorney General, Nolan H. Rogers, Assistant Attorney General,* and *Charles C. Grice, Special Attorney,* on the brief, for appellant.

*Howard G. Goldberg,* with whom were *Wm. B. Somerville* and *Smith, Somerville & Case* on the brief, for Transamerica Insurance Company, one of appellees. *Robert S. Paye,* with whom were *Geppert, McMullen & Paye* on the brief, for E. C. Womack, Inc., appellee.

ORTH, J., delivered the opinion of the Court.

This appeal stems from an action at law instituted in the Circuit Court for Allegany County on 29 October 1971 by the State of Maryland against E. C. Womack, Inc. (Womack) and Transamerica Insurance Company (Transamerica). On 26 April 1967 the State entered into a contract with Womack for the construction of approximately four miles of the Cumberland Thruway, Maryland Route 48. Womack furnished a performance bond, sometimes called a contract bond, with Transamerica as surety. The suit was predicated upon actions of Womack in disposing of waste materials while it was engaged in the construction of the road. Womack had defaulted in its performance of the contract in November 1968 when it went into receivership, and Transamerica, as required by the performance bond, had completed the job. The State's declaration sought damages resulting from Womack's negligence in disposing of the waste and from his breach of contract with respect thereto. Transamerica filed a counterclaim against the State for the unpaid contract balance which the State had retained.[1]

---

1. Womack filed a third party complaint against Green Associates, Inc., which had designed a part of the road, alleging that the design had been improper. At the conclusion of the trial, the court dismissed the action as to Green Associates, Inc., upon motion made by it.

The case went to trial on 15 July 1975. The court filed an opinion on 19 November 1975, rendering a verdict in favor of Transamerica and against the State with damages in the amount of $283,373.97 and interest and a verdict in favor of the State against Womack with damages in the amount of $142,818.33 and interest. Judgments absolute were entered on 2 February 1976. The State noted an appeal to the Court of Special Appeals.[2] We granted writ of certiorari before decision by that court.

The State presents four questions on appeal. Verbatim they read:

"1. Was the Trial Court in error in its determination that the surety, Transamerica Insurance Company, was released from liability for negligent acts of the principal, E. C. Womack, Inc.?

2. Was the Trial Court in error in its determination that the surety, Transamerica Insurance Company, was released from liability for the breach of contract of the principal, E. C. Womack, Inc.?

3. Was the Trial Court in error in its determination of the amount of compensatory damages, when it eliminated the construction costs of the section of the relocated drainage system from the west side of U. S. Route 220 to the Potomac River?

4. Was the Trial Court in error in its computation of damages, when it failed to include the internal engineering and design costs incurred by the State of Maryland?"

In the opinion accompanying the verdicts, the trial judge, in material part, accurately recounted the circumstances surrounding two wasting operations of Womack, one on a right-of-way of the State and the other on private property. With respect to the State's right-of-way, Womack requested

---

2. On 24 December 1975, before final judgments were entered, Womack noted an appeal. On 3 February 1976, stating that "[a]ll counsel and the Court having stipulated and agreed that Final Judgment . . . will not [be] entered until the Court's Decision on the pending New Trial Motions is filed", it requested that the appeal be dismissed "without prejudice." The new trial motions were denied. Womack did not thereafter file an appeal.

permission to waste excess fill thereon, and its request was granted upon certain conditions. Womack completed this operation in accordance with the permission given and in full compliance with the conditions imposed. This operation demonstrated, the trial judge opined, the right method to be used to dispose of waste material:

> "There was a compaction of the waste material. This was accomplished by the use of compacting pieces of equipment, a sheep's foot roller and a rubber tired compactor. Upon completion of the waste operation, the entire area of the waste pit was covered with at least two inches of top soil and seeded and mulched. This waste area has remained stable."

No problems whatsoever arose from the wasting area on the State's right-of-way. Clearly, this operation had no adverse effect. There was no wash out, and the drainage system was not affected.

This was not so with respect to the wasting operation on the private property. It differed both in method and result. The trial judge observed that it demonstrated the wrong way to dispose of waste material. He described what was done:

> "Chelsie A. Liller owned the land adjoining the right-of-way of the State Highway Administration. Subject to a private agreement with Liller, E. C. Womack, Inc., wasted material on the Liller property, located on the top and side of a hill overlooking State Highway U. S. Route 220 and also a natural ravine which the State intended to use to carry the water run-off from the highway being constructed. Wasting was done by end-dumping from trucks and there was no compaction except that which resulted from the operation of the equipment at the top of the fill. No further precautions were taken to prevent the waste from sliding. There is also evidence that an artificial

impoundment formed on the surface at the top of the fill area."

The court expounded on this:

"The trucks would end dump at the top of the fill and a bulldozer would push it over the side of the fill. The only compaction that took place resulted from the operation of the trucks and the bulldozer over the fill. No special attention was given to compaction. Also, after this waste operation was completed, no effort was made toward the vegetation of this area. Prior to July 14, 1968, the night of the washout or landslide, there is evidence of minor slides or a breaking away of the waste material along the slope. There is also evidence of small impoundments of water on the top surface of the fill which became prime causes for the washout or landslide."

The landslide or washout of 14 July 1968 occurred during a heavy rain. "[P]art of the waste material placed [on the Liller property by Womack] washed down the hillside, and onto U. S. Route 220, making the natural ravine useless and causing considerable damage to property owners located at the foot of the hill." The State cleaned up the debris deposited on Route 220 by the landslide and ultimately constructed an alternate area-wide drainage system because it alleged the landslide had rendered the natural drainage ravine useless. It sought, in the action instituted, to recover the costs of this work, and based the action with respect to Transamerica on the performance bond, also known as the contract bond. It declared: "The terms of the contract bond make Transamerica responsible as surety for any damage arising out of the negligence of ... Womack or for any expense incurred through Womack's failure to complete the work as specified." [3]

---

3. The wasting operation on the Liller property led also to an action by the State in the Circuit Court for Allegany County in August 1972 for injunctive relief against Liller and Womack to abate a public nuisance — the earth slides falling onto Route 220. The court issued a prohibitory injunction against Liller forbidding Liller's "maintaining the earth and

## Questions (1) and (2)

Code (1957, 1964 Repl. Vol.) Art. 89B, § 24 (see Acts 1975, ch. 566), concerning competitive bidding for the construction of a State highway, included the requirement that "... the successful bidder shall promptly execute a formal contract to be approved as to its form, terms and conditions by [the State Roads] Commission and shall also execute and deliver to said Commission a good and sufficient bond to be approved by said Commission to the State of Maryland in not less than the amount of the contract price. In no case shall any bond be approved or accepted unless the obligors bind themselves therein to the payment of all just debts for labor and materials incurred by the bidder in the construction and improvement of the road contracted for." At the time Womack entered into the contract with the State, Code (1957, 1964 Repl. Vol.) Art. 90, § 11 (a) [4] provided that before any contract exceeding $5,000 for the construction of any public work is awarded to any person, he shall furnish the State two bonds which shall become binding upon the award of the contract. The bonds were "(1) A performance bond executed by a surety company authorized to do business in this State satisfactory to the public body awarding the contract, and in such amount as it shall deem adequate, for the protection of the public body" and "(2) A payment bond executed by a surety company authorized to do business in this State satisfactory to the public body for the protection of all persons supplying labor and materials, ... to the contractor or his subcontractor in the prosecution of the work provided for in the contract for

rock storage material ... in its present state," and a mandatory injunction commanding Liller "to abate the nuisance by eliminating the danger of earth slides by whatever engineering practices will reasonably assure the stability of the material, whether that involves grading, compacting, terracing, planting or other action...." Affirming the decree, the Court of Special Appeals in Liller v. State Highway Adm., 25 Md. App. 276, 281, 333 A. 2d 644, 648 (1975) clearly indicated that at the time the wasting operation was being conducted, the State had no control over it or any obligation with regard to it. See, however, Code (1974) Natural Resources Article, § 1-303 and § 8-1105 now in effect.

4. The Section was thereafter codified as Code (1957, 1973 Repl. Vol.) Art. 21, § 9-112, and today appears as Code (1974) Real Property Art. § 9-113. No changes were made during the Code revisions.

the use of each such person. The bond shall be in the amount not less than fifty per centum (50%) of the total amount payable by the terms of the contract." Womack furnished such a performance bond and a payment bond. It also obtained insurance coverage as shown by a certificate offered into evidence by Transamerica and included in the joint record extract appended to the State's brief. Liberty Mutual Insurance Company certified that Womack was insured by it under a comprehensive general liability policy in the amount of $1,000,000 for each of bodily injury liability and property damage liability with respect to the construction contract.[5]

"The purpose of the [payment] bond, based on the statute, is to protect subcontractors and materialmen on State or other public projects where they have no lien on the work done." *Montgomery County v. Glassman*, 245 Md. 192, 201, 225 A. 2d 448, 453-454 (1967); *Hamilton v. Board of Education*, 233 Md. 196, 200, 195 A. 2d 710, 712 (1963). The purpose of the performance bond, in the words of the statute, is "for the protection of the public body", in this case the State. Its statutory object is to assure the construction and completion of the work contracted for. That is, the purpose of the performance bond, as its name implies, is to secure to the State the performance of the contract for the construction of the public work. The purpose of the liability insurance policy was to protect Womack itself against loss from its negligent acts. Unlike the liability policy, which was a contract between two parties, Womack and Liberty Mutual, standing in the relationship of insured and insurer, the performance bond involved three parties, the contractor or principal, Womack, the surety, Transamerica, and the obligee, the State.[6] It is the re-

---

**5.** The trial court observed that liability insurance was required by the construction contract.

**6.** E. H. Cushman, *Surety Bonds, on Public and Private Construction Projects*, 46 A.B.A.J. 649, 652 (1960), quotes from Dr. Jules Backman's study of corporate suretyship, *Surety Rate Making* 53 (1948):

"Contract Bonds: These bonds are the largest single classification in the surety field... There are relatively few risks of the same type, there is practically no sharing of experience, they are subject to extraordinary loss hazards, premiums are not the

spective rights and obligations of these three parties under the performance bond which comprise the heart of this case.

The performance bond supplied by Womack provided that Womack, as the contractor, and Transamerica, as the surety, were "held and firmly bound unto the State of Maryland in the full and just sum" of $3,715,869.00 to be paid to the State and to which payment Womack and Transamerica bound themselves, their "heirs, executors, administrators and successors, jointly and severally . . . ." The "Whereas" clauses referred to the contract between Womack and the State to construct the road for the sum of $3,715,869.00 and stated that "[i]t was one of the conditions of the award of the State Roads Commission, acting for and in behalf of the State of Maryland, pursuant to which said Contract was entered into that these presents should be executed." We set out the condition of the bond verbatim:

> "NOW THEREFORE, the condition of this obligation is such that if the above bounden Contractor shall in all respects comply with the terms and conditions of this Contract and fully meet and perform his, their or its obligations thereunder, including the Plans, Specifications and Special Provisions there in referred to, and made a part thereof, and such alterations as may be made in said Plans and Specifications as therein provided for, and shall well and truly and in a manner satisfactory to the State Roads Commission, complete the work contracted for, and shall save harmless the State of Maryland, and the State Roads Commission from any expense incurred

---

chief source of loss payments to obligees, they are non-cancellable, losses are salvaged to a substantial degree, business cycle impacts are substantially greater both in terms of volume of premiums and loss ratios, and loss fluctuations over the 25 year period were very wide. Contract bonds involve essentially an extension of credit rather than the spreading of risks. In the light of these factors, insurance criteria cannot be applied to contract bonds."

Cushman's view is that it is the addition of the third party contractor or principal, which creates a basic difference between insurance and suretyship. He expounds on his view in detail. *Compare* Women's Hospital v. Fid. & Guar. Co., 177 Md. 615, 618-619, 11 A. 2d 457, 459 (1940).

through the failure of said Contractor to complete the work as specified, or from any damages growing out of the negligence of the said Contractor, or his, their or its agents and employees or from any liability for the payment of any wages due or materials furnished in connection with said Contract; and if said Contractor and all Subcontractors to whom any portion of the work provided for in said Contract is sublet and all assignees of said Contractor and of such Subcontractors shall promptly make payment for all labor performed, materials furnished, machinery, utilities, and services rendered whether such are incorporated in the Contract or not, but entering into the work covered by said Contract, whether or not the said material or labor enter into and become component parts of the work contemplated.

And also shall save and keep harmless the said State of Maryland against and from all losses to it from any cause whatever, including costs of transportation by water, rail or otherwise, and patent, trademark and copyright infringements, but without limiting the aforegoing, in the manner of constructing said improvement, then this obligation shall be null and void; otherwise it shall remain in full force and virtue."

We summarized the criteria for the interpretation of bonds in *Walsh v. Jefferson Association,* 216 Md. 131, 137, 139 A. 2d 847, 850 (1958):

"The cardinal rule in the interpretation of bonds, as in the interpretation of all written contracts, is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles. *Levy v. Glens Falls Indem. Co.,* 210 Md. 265, 273, 123 A. 2d 348. While the contract of a surety for profit is not to be so strictly construed as one of a surety not for gain, *Women's*

Hospital v. Fid. & Guar. Co., 177 Md. 615, 618, 11 A. 2d 457, Lange v. Board of Education, 183 Md. 255, 260, 37 A. 2d 317, it is clear that the liability of a surety is not to be extended, by implication, beyond the terms of its contract, Art, etc., Corp. v. Fidelity Con. Corp., 194 Md. 110, 116, 69 A. 2d 808, but the nature of the duty of the obligor and the character of the obligee must be regarded as explanatory of their intent. Strawbridge v. Baltimore & O. R. R. Co., 14 Md. 360. The meaning of the terms of the bond, including the condition contained therein, are to be ascertained by reference to the language of the [contract covered by the bond] and pertinent statutes; . . . ."

See A/C Electric Co. v. Aetna Ins. Co., 251 Md. 410, 416-418, 247 A. 2d 708, 711-712 (1968); Fid. & Dep. Co. v. Lumber Co., 176 Md. 217, 222, 4 A. 2d 447, 450 (1939). Women's Hospital v. Fid. & Guar. Co., supra, 177 Md. at 618-619, 11 A. 2d at 459, gives the criteria in a different form, enumerating "established principles" followed in the construction of bonds. As indicated, a bond is to be construed in connection with the contract whose performance it secures. Lange v. Board of Education, supra, 183 Md. at 261, 37 A. 2d at 320. We said in General Builders v. MacArthur, 228 Md. 320, 326, 179 A. 2d 868, 871-872 (1962): "The liability of a surety is coextensive with that of the principal, and it is clear that the liability of the surety is measured by the contract of the principal." Thus, "[w]here the contract incorporates as a part of itself the specifications, and the contract is, by reference, incorporated as a part of the bond, the contract, the specifications and the bond must all be construed together." Lange v. Board of Education, supra, 183 Md. at 261, 37 A. 2d at 321.

It is patent, as we have indicated, that the State's action as to Transamerica was predicated upon the performance bond, and in its brief it so declares. A copy of the performance bond is included in the joint record extract. Transamerica notes in its brief that "the State relies on the language of a bond form which was never introduced into

evidence", and suggested in a footnote: "Generally, an appellate court will not consider evidence which was not offered or introduced in the lower court." There is no indication that the document itself was excluded upon any objection made. A copy of the performance bond was attached to and made a part of the State's declaration, Transamerica's answer and Transamerica's counterclaim. The bond's provisions were discussed by the trial judge in his opinion and considered, construed and applied by him in arriving at the verdicts. The bond was as fully before the court as if it had been formally offered in evidence. The court and the parties so considered it below, and in the circumstances, so shall we on appeal. *See Thompson v. Phosphate Works*, 178 Md. 305, 325-326, 13 A. 2d 328, 337-338 (1940); *Wathen v. Pearce*, 175 Md. 651, 662, 3 A. 2d 486, 491 (1939); *Dean v. Eastern Shore Trust Co.*, 159 Md. 213, 220-221, 150 A. 797, 800-801 (1930).

We deal initially with the State's position that Transamerica should have been held liable under the performance bond because Womack breached its contract with the State "when the off-right of way activities destroyed the drainage system and forced a complete re-design" because it may be summarily disposed of.[7] The invoking of the surety's liability under the performance bond by breach of the construction contract does not plainly appear by the record to have been tried and decided by the court below. There is nothing in the joint record extract or appendix to show that the breach of contract point was presented at the trial. The opinion of the trial judge gives no

---

**7.** The averments under the second count of the State's declaration spoke of the construction contract and the performance bond and referred to the agreement to waste excess material on Liller's property. It was alleged that this wasting operation breached the specifications of the construction contract "by failing to tamp, failing to waste said material in accordance with the accepted standards for wasting on the State Roads Commission Right-of-Way, failing to secure the waste operation with top soil or seeding of grass or other erosion preventive materials; by wasting material in the natural watercourse, by wasting such material in a manner that created ponds or impoundments; all of said acts in violation of the terms and conditions of the aforesaid contract. . . ." The declaration set out that landslides from the wastage impoundment had damaged Route 220 and the drainage system forcing the State to construct an alternate drainage system and declared that the damage suffered by the State was the direct result of the breach of Womack's contract.

indication that the point was tried; it deals only with the matter of negligence in the consideration of the liability of Transamerica under the performance bond. The requirements of Maryland Rule 828 b 1 that "[t]he printed extract shall contain such parts of the record as may be reasonably necessary for the determination of the question presented by the appeal . . . ," are mandatory. *Riggs Nat'l Bank v. Welsh*, 254 Md. 207, 218-219, 255 A. 2d 289, 290 (1969); *State Roads Comm. v. Sharper*, 231 Md. 411, 413, 190 A. 2d 647, 649 (1963). The point is not properly before us, and we do not consider it. Maryland Rule 885; *Basiliko v. Royal Nat'l Bank*, 263 Md. 545, 549, 284 A. 2d 227, 229 (1971).

The record before us has an additional serious deficiency. The construction contract, which the State claims Womack breached in the wasting operations, is not included in the joint record extract appended to the State's brief, and does not appear in the appendix submitted by Transamerica, is not with the record transmitted to us, and according to Transamerica, was never even offered in evidence below.[8] We must measure the liability of Transamerica by the contract of Womack, and this we cannot do when the contract is not before us. In *General Builders v. MacArthur, supra,* we were faced with a similar situation. We noted that the construction contract and the appended plans and specifications were not included in the record extract, "as they probably should have been," but found enough in the record extract and appendix to show the contract had in fact been breached. *Id.,* 228 Md. at 326, 179 A. 2d at 872. Here, there is not enough in the record extract and appendix to show what provisions, if any, were in the contract pertaining to wasting operations. Even on an assumption that the contract upon which the cause of action under the second count of the declaration was based was before the court below, and that the court released Transamerica from liability for the breach thereof by Womack, we would be unable to review the propriety of the ruling. The State simply failed to place the contract before us, and the failure,

---

8. On 9 December 1971 Transamerica filed a demand for production of the construction contract referred to in the declaration. Maryland Rule 326. The record does not disclose compliance with the demand.

in the circumstances, would, in any event, be fatal to any consideration by us of the second question.

We turn to the first question, which asks if the trial court was wrong in determining that Transamerica was not liable for the negligent acts of Womack.

The trial court found that Womack was negligent with respect to the waste deposited on the Liller property, that its negligence was the proximate cause of the injuries suffered by the State resulting in the damages incurred, and that there was no negligence on the part of the State thereto contributing.[9] These findings are not contested on appeal, and, in any event, there was evidence adduced which was legally sufficient to support them. Maryland Rule 886.

The trial court next considered whether Transamerica was responsible to the State under the terms of the performance bond for the negligence of Womack, and concluded that it was not. The court said:

"The negligence provision of the construction bond is applicable only when the negligence of the contractor occurred while it was performing or failing to perform the requirements of the construction contract. The purpose of the bond is to assure the State Highway Administration that the construction contract will be fully performed without further liability to the State than that provided for in the construction contract. In other words the purpose of the bond was to secure a proper compliance with the terms and provisions of the construction contract. The wasting operation on the Liller property was not required under the provisions of the construction contract. The State was without authority to direct the placement of the waste nor could it police the activities of the contractor on the Liller property or any other private property (Liller, Supra). The State had no interest in the waste operation so long as it

---

**9.** The court referred to Liller v. State Highway Adm., 25 Md. App. 276, 333 A. 2d 644 (1975), see note 3 *supra,* in finding no contributory negligence on the part of the State.

occurred on other than State property. The manner of wasting and the location of the waste site were solely within the jurisdiction of the contractor. Since this bond was executed in conjunction with a construction contract it would afford protection to the State only with regard to the activity referred to in the construction contract and would not apply to damage to property other than that under construction and within the limits of State property."

The trial court noted that the State accepted the completed highway without reservation prior to the filing of the instant suit. There was legally sufficient evidence to support this view. It was its opinion, therefore, "that Transamerica has fulfilled its obligation under the terms of the contract bond." The court lastly referred to a comprehensive liability insurance policy carried by Womack as required by the contract and noted that it was filed with and accepted by the State Roads Commission. The court observed that the State "must now look to Liberty Mutual for satisfaction of the damages it incurred as a result of the negligence of the contractor", and, it is apparent that the court considered the insurance policy as going to the intent of the parties with respect to the performance bond.

The argument of the State gives little support to its claim that the trial court was wrong. Under the heading "General Authorities Applicable to Questions 1 and 2", it touches briefly on the general principles controlling the construction of contract bonds, which are not at material variance with what we have herein discussed. Specifically addressing question (1), it gives "[a] distillation of the contract bond" as "expressing the essence" of the joint and several liabilities of Womack and Transamerica "insofar as they relate to negligence", but does not comment further thereon. It refers to the statutory requirement to furnish a performance bond and baldly states that the General Assembly by the enactment of that statute "has determined that public protection necessitates the filing of contract bonds on all matters of significant monetary value." This statement is

correct if the phrase "all matters" is restricted to matters within the contemplation of Art. 90, § 11. The State continues: "Furthermore, the public must be protected from any expense or damages growing out of the negligence of a contractor. Strict construction of the terms and provisos of a contract bond in favor of the contractor and his surety would be contrary to the intent and purpose of said act." Alleging that the Maryland courts, when interpreting surety contracts made for profit, apply insurance contract interpretation rules, the State asserts: "Hence, any ambiguities are interpreted against the company." It quotes *General Builders v. MacArthur, supra,* for the proposition that the liability of the surety is measured by the contract of the principal and proceeds without further ado to the next question.

Transamerica claims that neither the Maryland legislature nor the parties to the contract bond intended the surety to be held liable when the contract for which the bond was issued was fully performed and when the damage incurred by the State was not to property included within the terms of the construction contract.[10] It points out that the State's claim that Transamerica should have been held liable by the trial court under the performance bond is made in the face of uncontradicted evidence that the work covered by the construction contract was fully completed in accordance with all applicable plans and specifications, that the wasting operation in the State's right-of-way did not violate the construction contract and was performed in accordance with the State's permit, no portion of that wasted material being involved in a landslide or interfering with the drainage system, that the State either as a sovereign body or under the construction contract had no authority, statutory or otherwise, to control Womack's activities on private property and did not seek to exercise any such authority, that the construction contract, plans and specifications did not apply to Womack's activities on the Liller property, that no part of the work under contract

---

**10.** Questions 1 and 2 presented by the State are ignored by Womack. It does not address either question in its brief.

was damaged by Womack's negligence, and that the State required Womack to obtain comprehensive general liability insurance coverage. The State did not file a reply brief disputing, refuting or contradicting these suggestions as to the evidence. "In effect," Transamerica asserts, "what the State wishes to do here is to transform a surety bond guaranteeing performance of a public works agreement into an all risks insurance policy and to require the surety to become an insurer of all State property wherever located which might conceivably be damaged by the surety's principal during or after the construction period, regardless of whether the work for which the bond had been issued was fully completed in accordance with all contract documents." Although finding no Maryland decision on the point, Transamerica refers to cases in other jurisdictions as uniformly interpreting statutory provisions such as those contained in Code (1957, 1969 Repl. Vol.) Art. 89B, § 24, requiring that the contract bond be in an amount not less than the amount of the contract price "as implying that a bond executed in conjunction with a construction contract is to afford protection *only* with regard to the activity referred to in the contract and would not be applicable to damage to property other than that under construction." The cases cited,[11] however, go to injuries caused by the negligence of the contractor suffered by persons, other than the parties to the bond, that is, the contractor, surety and obligee. The common thread running through the cases cited is that liability under the bond extends, in any event, only to the parties intended to be benefited by the bond, ordinarily the State with respect to performance provisions, and persons furnishing labor and material used in the construction of the public work with respect to payment provisions (if not in a

11. United States Fidelity & Guaranty Co. v. Eubanks, 87 S.W.2d 248 (Texas 1935); City of University City v. Frank Miceli & Sons R. & B. Co., 347 S.W.2d 131 (Mo. 1961); Tri-State Insurance Company v. United States, 340 F. 2d 542 (8th Cir. 1965); John L. Roper Lumber Co. v. Lawson, 143 S. E. 847 (N. C. 1928); National Surety Co. of New York v. Ulmen, 68 F. 2d 330 (9th Cir. 1934); Water W., G. & S. Bd., Oneonta v. P. A. Buchanan, Cont. Co., 318 So. 2d 267 (Ala. 1975); DeVries v. City of Austin, 110 N.W.2d 529 (Minn. 1961); Foshee v. Daoust Const. Co., 185 F. 2d 23 (7th Cir. 1950). *See,* Annot., 27 A.L.R. 3d 663 (1969); Annot., 58 A.L.R. 2d 865 (1958); Annot., 13 A.L.R. 2d 191 (1950).

separate bond). In the case *sub judice*, it is the State as obligee, named in the bond as a party, which seeks to invoke liability of the surety under the bond for negligence of the contractor. The obligation of the surety to persons outside the parties named in the bond is not involved here. It is the liability of the surety to the obligee with which we are here concerned. This is determined by applying the criteria set out in the opinions of this Court which we have hereinbefore discussed. The liability of Transamerica cannot be extended, by implication, beyond the bond provisions. The provisions are explained by reference to the language of the construction contract and pertinent statutes, taking into consideration the nature of the duty of the obligor and the character of the obligee. All of this goes to the cardinal consideration, the intention of the parties.

As we have indicated, the construction contract has not been put before us. We can tell from the record extract and appendix that it called upon Womack to construct a certain portion of a State highway, and, on the record we have, we cannot say that the trial court was clearly in error in finding that the contract had been completed to the satisfaction of the State. As the contract is not before us, we are not able to look to its language in interpreting the bond conditions, but we do not think we need to do so in the circumstances, for we find that the language of the bond itself and the statute requiring that it be furnished clearly indicate the meaning of its provisions.

The statute pursuant to which the bond here was furnished speaks to the nature of the bond only in these aspects: (1) the bond is called "a performance bond" without definition of "performance"; (2) it must be executed by a surety, authorized to do business in Maryland, which is satisfactory to the public body awarding the contract for the public work to be constructed; (3) it must be in an amount which the public body deems adequate; (4) it must be for the protection of the public body. It is apparent that the sole statutory object is to secure the construction and completion of the public work contracted for. We do not see in the language of the statute any intendment that the surety be

responsible to the public body for negligent acts of the contractor not encompassed within the work agreed to be performed. On the record before us, the work agreed to be performed was the construction of the highway with no showing that it extended to the wasting of materials on private property. Having ascertained that the pertinent statute does not require that Transamerica assume liability under the performance bond for the negligent acts of which Womack was guilty, we look to the conditions of the bond itself. The parties to the bond could, of course, agree to conditions which would protect the State beyond the statute's contemplation, but we do not think they have done so here. The bond makes specific reference to the construction contract, stating that it was executed as one of the conditions of the award of the contract. The conditions spelled out in the bond are in the context of Womack's complying with the terms of the construction contract, completing the work contracted for in a manner satisfactory to the State. The bond designates certain matters as to which Womack shall save the State harmless. One is "from any damages growing out of the negligence of the said Contractor, or his, their or its agents and employees." But the State cannot pluck this clause from the bond and rely upon it, ignoring all other provisions which throw light upon and demonstrate what was meant by the phrase relied upon. "[T]he intention of the parties to an agreement must be garnered from the terms considered as a whole, and not from the clauses considered separately." *Laurel Race Course v. Regal Constr.*, 274 Md. 142, 153, 333 A. 2d 319, 327 (1975) and cases therein cited. The clause concerning the negligence of the contractor is included in a sentence designating other matters which the contractor is to save the State harmless. One such matter, set out immediately before the negligence clause, reads "any expense incurred through the failure of said Contractor to complete the work as specified", and another such matter, immediately following the negligence clause is "any liability for the payment of wages due or materials furnished in connection with said Contract." It is

clear that the intention of the parties, garnered from the terms of the bond considered as a whole, was that the clause pertaining to the negligence of Womack, apply only with respect to the work to be performed under the construction contract. There is added support for this view in the catch-all clause near the end of the bond whereby Womack agrees to "save and keep harmless the State of Maryland against and from all losses to it from any cause whatever . . . in the manner of constructing said improvement. . . ." In short, every condition of the bond which must be satisfied to release the surety is with respect to the work agreed to be performed under the construction contract. It is apparent that the negligence clause was not intended to be treated otherwise. The bond is plain and unambiguous. A reasonable person in the position of the parties would have thought that the conditions prescribed in the bond, including that in regard to negligence and that in regard to all losses to the State from any cause whatever, related to the work under the construction contract. The language of the bond being clear, this is the true test of the intention of the parties. *Kasten Constr. v. Rod Enterprises*, 268 Md. 318, 328-329, 301 A. 2d 12, 18 (1973). As this intention is not inconsistent with an established principle of law and is consistent with the statute requiring the bond, it must be given effect. We hold that the trial court did not err in its determination that Transamerica had no liability for the negligent acts of Womack in its wasting operation on the private property.[12]

### (3) and (4)

The State contends that the trial court erred in its computation of damages because it eliminated the construction costs of the section of the relocated drainage

---

**12.** Were the bond here not plain and unambiguous, so that there was room for construction, the fact that the construction contract, according to the trial court, required Womack to carry comprehensive liability insurance would provide some indication of the intention of the parties. There is authority that in the absence of specific agreement, a performance bond is not a substitute for public liability insurance covering the contractor's tort liability. Tri-State Insurance Company v. United States, 340 F. 2d 542, 545 (8th Cir. 1965); City of University City v. Frank Miceli & Sons R. & B. Co., 347 S.W.2d 131, 134 (Mo. 1961); Kniess v. American Surety Co. of New York, 300 N. W. 913, 916 (Wisc. 1941).

system from the west side of U. S. Route 220 to the Potomac River, question (3), and because it failed to include the internal engineering and design costs incurred by the State, question (4). The cost of the drainage system not included by the court was $82,719.00. The design and engineering work for the alternate drainage system was performed by the State Highway Administration staff. The normal engineering and overhead factor is 18% of the contract price. By this formula $25,470.83 should be added to the judgment the court awarded, and if the cost of the excluded drainage system were included the amount to be added would be $40,360.23.[13]

Womack's position is that the trial court was correct in its assessment of damages in favor of the State and requests that the judgment thereon be affirmed.

No one disputes the propriety of the amount of $1,314.00 representing the cost of clearing the debris off Route 220. In the present posture of the appeal, the assessment for construction of two phases of the alternate drainage system is not challenged. The court thought that the necessity for their construction was adequately proved.

As to the excluded third phase of the alternate drainage system, the court found that the State had not met the burden of proof as to the necessity for its construction: "The weight of the evidence fails to show the inadequacy of the old culvert and drainage system under Route 220. While it may have been more advantageous to the State to have constructed the new culvert and drainage system under Route 220, there was a duty on the part of the State to use the existing facilities in order to mitigate damages." The

---

13. In its brief, the State does not challenge the correctness of the judgment in the amount of $283,373.97 rendered in favor of Transamerica against the State. Thus, the propriety of that judgment is not before us. Maryland Rule 846 (f). *See* note 7, *supra.*

Transamerica agrees that the court erred in its computation of provable damages, but claims that the damages assessed were $141,504.06 too high because the State, in any event, was entitled only to the costs of clearing Route 220 of the debris deposited by the landslide and not to any sum for the construction of the alternate drainage system. Its position, however, is contingent upon the judgment in favor of Transamerica being reversed. As we affirm it, Transamerica's contention with respect to the damages is moot.

State's argument on the point goes to the sufficieny of the evidence, and this was a matter for the trier of fact. Maryland Rule 886; *Knowles v. Binford,* 268 Md. 2, 298 A. 2d 862 (1973). On the record, we cannot say that the trial court's judgment was clearly erroneous.

The State complains that the trial court completely disregarded the matter of staff expenses in the design and engineering work for the by-pass system. It is correct that the court did not speak expressly to this matter in its opinion, and it is manifest that it made no allowance for such costs. Womack says: "[The State's] evidence totally fails to prove any overhead expenses at all were incurred, and failed to establish the specific amounts thereof, as well as the necessity for and the reasonableness of the expense." The record extract submitted by the State with its brief is as inadequate on the point as is its argument. There is an extract of testimony but who is testifying is not identified. By reference to the transcript of the testimony and the Appendix submitted by Transamerica, it appears that the only evidence adduced by the State on the matter of staff expenses was through Hubert H. Jenson, an employee of the State Highway Administration in the office of Finance and Management. He was asked how the State computes the overhead when it does the engineering of a project of the nature of the by-pass drainage system. He replied: "There is a fixed percentage that is applied as overhead. That percentage is worked up by a Cost of Budget Section each year. Each fiscal year the overhead application rate or the engineering rate would change, vary." He said that "the overhead and engineering figure arrived at, using the system at that time" was 18%. There was no explanation whatsoever as to how the 18% of the cost to be charged as engineering or overhead was arrived at, or that it was reasonable or necessary. There was no showing as to what design work was done, the number of hours spent performing it, or the use to which the design work was put. *See Metropolitan Auto Sales v. Koneski,* 252 Md. 145, 154, 249 A. 2d 141, 146 (1969). In short, there was no evidence legally sufficient to require or permit the trial court to

award the State some forty thousand dollars for a design or engineering fee, and the court was not clearly wrong in not awarding it.

*Judgments affirmed; costs to be paid by appellant.*