ALLEN *v.* STEINBERG, ET AL., ETC.

[No. 442, September Term, 1965.]

*Decided October 12, 1966.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, BARNES and McWILLIAMS, JJ.

*Charles C. W. Atwater* and *Thomas A. Garland,* with whom was *Walter C. Mylander, Jr.,* on the brief, for appellant.

*William F. Mosner,* with whom were *Power & Mosner* on the brief, for appellees.

HAMMOND, C. J., delivered the opinion of the Court.

Below and here the claims of appellant, a limited partner in a partnership for "the ownership and promotion for develop-

ment of a tract of land," against the general and managing partners might be paraphrased to be that she was a sheltered ewe, who, despite the guidance of a learned and experienced shepherd (her husband), was led by the general partners not to the slaughter but to the shearing area where she was fleeced of her investment and anticipated profits. Her bill of complaint sought an accounting as a basis for the return of that investment and the profits she would have received had not the partnership been "fraudulently breached" or, alternatively, damages that she says resulted from "the deceit practiced against her in the solicitation of her investment." Judge Raine dismissed the bill at the end of the complainant's case, apparently adopting the philosophy of Goethe that "mighty is the law but mightier still is necessity," for he ruled that "the lending of money to the multiple corporations [in which the partnership had no interest and which built houses on lots leased to them by the partnership for ninety-nine year ground rents] * * * was necessary, as a practical matter, to the success of the venture and was legally permissible * * * [for] if the building corporations had not been able to supplement their funds by borrowing money from the partnership, then they would not have been able to build any houses and the whole project would never have gotten off the ground * * *."

The case was decided on those allegations of the bill which were admitted by the answer, the exhibits, and the testimony of the appellant's witnesess—her shepherding husband and the accountant of the partnership. Maryland Rule 535 now provides that in any action tried by the court without a jury at law or in equity, a party "may move at the close of the evidence offered by an opponent for a dismissal on the ground that upon the facts and the law he has shown no right to relief."

Rule 535, promulgated in 1961, added actions in equity to the practice formerly applicable to actions at law tried without a jury under Rule 565, which was a successor to Trial Rule 5 "Demurrer to Evidence." In *Eastern Contractors v. Zinkand,* 199 Md. 250, 251, 256, a law action tried without a jury, the Court said:

"In the Reporter's Explanatory Notes to the rules it is stated 'Rule 5 merely provides the equivalent of

a directed verdict in cases tried by the court alone
* * *.' Code, 1947 Supp., page 2075. Whether Rule
5 may in any event provide more or less than the ex-
act equivalent of a directed verdict, we need not con-
sider."

The Court went on to say that in the case before it the defen-
dant's request to prevail at the end of the plaintiff's case would
be regarded as testing the legal sufficiency of the evidence, and
then said: "On motion for a directed verdict for defendant we
must take the view of the testimony, *i. e.,* draw the legitimate
inferences, most favorable to the plaintiff." See also *M. & R.
Contractors and Builders, Inc. v. Michael,* 215 Md. 340, 344.

We think that in deciding whether to dismiss an equity ac-
tion at the close of the complainant's case, the chancellor under
Rule 535 must view the evidence, that is, draw the legitimate
inferences most favorably to the complainant, and that Judge
Raine did not do this. The evidence presented by the complain-
ant, viewed in the light most favorable to her, included the
following.

The three appellees owned, as general partners, eighty-four
acres of land on Old Court Road in Baltimore County which
they had encumbered with purchase money mortgages total-
ing some $365,000. In late 1958, in order to get funds with
which to operate, they began solicitation of investments by in-
dividuals who were to become limited partners. One of those
solicited was appellant's husband. He had five or six conversa-
tions with the general partner who was acting on behalf of the
partnership in the course of which he made it clear that he and
his wife would not be interested in "any building operation
whatsoever" but that "if this was a land deal" he would be in-
terested. In return came the assurance "that this was a land
deal, that the people who would invest in this project would
have nothing to do with the building operation." The limited
partners' monies would be used to release portions of the part-
nership land from the purchase money mortgages. Lots would
then be leased to one of several building corporations which
would build houses on them. The ground rents received by the
partnership for leasing the lots were to serve to return the lim-

ited partners' investments and add a profit. Some eight acres of the land were to be retained for a shopping center and two acres were to go to the school board at $20,000 an acre. The appellant invested $10,000 by giving the partnership a check dated April 8, 1959. Before the check was sent, the soliciting general partner was asked to send appellant a written outline of the proposed operations of the partnership, as he had promised to do when he described them orally as a basis for the investment. He again agreed to do so and the check went forward. A letter comprising "a brief sketch of how the Belle Farm Estates [the partnership] operates" went to the Allens on April 14, 1959. It read in significant parts as follows:

> "The entire tract of land has been conveyed to the Belle Farm Estates partnership. The partnership, by mesne conveyance, took title to the land subject to a purchase money mortgage. The partnership in turn leases, subject to ground rents, specified number of lots to multiple building corporations, as established by the accountants for the partnership.
>
> "In all, the partnership will wind up with 267 ground rents of $120 and $150 each. Their capitalized value will amount to approximately $600,000.00. This amount approximates balance on purchase money mortgage ($350,000.00); (limited partners investment maximum $190,000.00); and (profits $63,000.-00)."

A partnership agreement dated March 10, 1959, between the general partners and the various limited partners was signed by the appellant later, probably after the check was sent on April 8. The executed agreement had been preceded by proposed drafts which the appellant's husband had edited, the most significant change being in the definition of the partnership business. In one proposed draft it was described as "the ownership and development of a tract of land." This was changed by the husband to "the ownership and promotion for development of a tract of land," and this became the agreement. A subsequent paragraph made the general partners attorneys in fact to accept title to all assets purchased and to execute "all

necessary deeds, bills of sale or any and all other papers for the conveyance of any or all of said assets in order to effectuate the purpose of said partnership."

The partnership was to continue until the ninth day of March 1961, when each of the limited partners was to be entitled to the return of his capital invested and up to thirty percent profit.

The general partners began development operations by conveying lots in fee to certain so-called "leasehold corporations," which mortgaged the fees for construction money and then conveyed the fees back to the partnership, which leased to a straw party to create ground rents. The straw party conveyed the leaseholds thus created to the leasehold corporation, the reversion remaining in the partnership. The effect was to hypothecate partnership land for the benefit of corporations in which the partnership had no interest. Later, when houses were sold and the construction mortgages released, the partnership possessed certain unencumbered ground rents. These were sold or mortgaged by the general partners, resulting in cash for the partnership which the general partners lent on unsecured loans to the construction company (the "leasehold corporations" had engaged one building company, owned by the general partners as individuals, to build the houses) which was incurring construction and development difficulties resulting in a shortage of cash.

When it developed that the partnership was making a profit, at least on paper, on which income taxes would have to be paid, the partnership, without the consent or knowledge of appellant, agreed with the leasehold and construction companies that it would, by agreements backdated to a date prior to the date of the partnership agreement, assume $275,000 of utility installation expenses (60 percent thereof). This was done by crediting $275,000 on the partnership books against the partnership loans to the leasehold-construction corporations. No other payment was made on the loans.

Finally, to raise still more money for the corporations, the general partners conveyed the remaining partnership land to a corporation controlled by them which executed a mortgage on it for $140,000 to a corporation known as KMK, Inc., and

then reconveyed the mortgaged land to the partnership, all again without the consent or knowledge of appellant.

All the partnership assets were thus dissipated and lost by assumption of utility costs, the making of unsecured loans and foreclosures of certain construction mortgages, the KMK mortgage and the purchase money mortgages.

The appellant contends that the general partners violated Code (1957), Art. 73, Partnerships—Limited, § 9, which provides:

> "A general partner shall have all the rights and powers and be subject to all the restrictions and liabilities of a partner in a partnership without limited partners, except that without the written consent or ratification of the specific act by all the limited partners, a general partner or all of the general partners have no authority to
>
> (a) Do any act in contravention of the certificate,
> * * *
>
> (d) Possess partnership property, or assign their rights in specific partnership property, for other than a partnership purpose,
> * * *."

We agree that the decisive question is whether the general partners acted "in contravention" of the partnership agreement or possessed partnership property or assigned their rights in specific partnership property for "other than a partnership purpose."

If the partnership agreement is looked to alone as the integration of the agreement of the parties, it would appear that the partnership purpose was to hold land and procure and facilitate its development by others. The phrase "ownership and promotion for development of a tract of land" would seem to negate the conclusion that direct development of or direct participation in development by the partnership was intended. The wording of the partnership agreement might leave open exactly how far and to what extent "promotion" might go, but it could hardly extend to subordinating ground rents to mortgages or making unsecured loans or mortgaging partnership land without receiving the proceeds of the mortgage. Any doubt as to

the meaning intended by the phrase "promotion for development" was removed, at least in the present posture of the case, by the extrinsic evidence which the chancellor received over objection by the appellees. We think it was proper to have admitted this evidence. Parole evidence is not admissible to vary, alter or contradict a writing which is complete and unambiguous, absent a claim of fraud, accident or mistake, "but where doubt arises as to the true sense and meaning of the words themselves or difficulty as to their application under the surrounding circumstances, the sense and meaning of the language may be investigated and determined by evidence *dehors* the instrument." Prescott, J. for the Court in *Eastover Stores, Inc. v. Minnix,* 219 Md. 658, 666. See also *Sommers v. Dukes,* 208 Md. 386; *Rinaudo v. Bloom,* 209 Md. 1, 11; *Vary v. Parkwood Homes, Inc.,* 199 Md. 411, 418; *Restatement, Contracts,* §§ 231, 238.

The appellees object particularly to the admission of the letter of April 14, 1959, claiming that it was not relied on by the appellant since it came after the agreement had been signed. The testimony leaves this in doubt but shows that the terms and provisions set out in the letter were written repetitions of what had been orally promised before the check was sent and the agreement signed and the promise to send the letter was an explicit and specific prerequisite to the sending of the check by the appellant. Under the circumstances we have no doubt the letter rightly came into evidence.

Appellees take essentially the same position as did Judge Raine—that the building operations were part of the "whole ball of wax" and that in the development of a tract of land, leasehold and construction corporations are customary and ordinarily derive funds for utilities and construction from the value of the underlying land. Appellees also assert that appellant knew that the procedures actually followed were contemplated or she acquiesced in them when she found out and may not now question them or their results.

On the first thrust of these contentions it may be noted that Judge Raine and the appellees may well be right as to the general and ordinarily to be expected practice of developers in recent years, when the developer is the owner of the land and

of the leasehold and building corporations. In such a case there is only one ultimate pocketbook. Here there are two and if there was to be loss in the building and sales aspects, it was under the agreement to be borne by others than the limited partners who did not need the insulation of corporate limited liability since they had achieved that insulation by their status as limited partners. The controlling factor here was not an ordinary practice but the practice the parties had agreed upon. The proof of the appellant was that this was not what appellees say is the ordinary practice. Further, the partnership relationship is a fiduciary one, a relation of trust. A partner is a trustee to the extent that his duties bind him, a cestui que trust as far as the duties that rest on his copartners. 1 Rowley, *Modern Law of Partnership*, §§ 341-42; *Restatement, Restitution* §§ 166 comment d, 190 comment a; 68 C. J. S. *Partnership* § 76; 40 Am. Jur. *Partnership* § 128; *Hagan v. Dundore*, 187 Md. 430. These authorities which consider the matter also hold that generally the principle of utmost good faith covers not only dealings and transactions occurring during the partnership but also those taking place during the negotiations leading to the formation of the partnership. See also *Knapp v. First National Bank and Trust Co.* (10th Cir.), 154 F. 2d 395, 398; *Stephens v. Stephens* (Ky.), 183 S. W. 2d 822, 824. Managing partners particularly owe a fiduciary duty to inactive partners. *Corr v. Hoffman* (N. Y.), 176 N. E. 383; *Einsweiler v. Einsweiler* (Ill.), 61 N. E. 2d 377.

It is also generally held that power and authority not specifically delegated in a partnership agreement is presumed to be withheld. See *Homestake Mining Co. v. Mid-Continent Exploration Co.* (10th Cir.), 282 F. 2d 787, following *Taylor v. Brindley* (10th Cir.), 164 F. 2d 235, 241-42, in which it was said:

> "It is our judgment that where two parties enter upon a joint venture with respect to acquisition and sale of real property, and they take the pains to specifically define and delimit the powers of each with reference to the sale and disposition of the property involved in the enterprise, they will be presumed to have delegated all the powers they intended to confer upon each other

in respect thereto, and to have withheld any power or authority which they failed to affirmatively delegate. * * * The power and authority of an agent or trustee to convey title to the realty of his principal or beneficiary is not lightly conferred nor readily inferable."

In the present case the authority given the managing partners was promotion for the development of land, and in this regard to accept title to purchased assets and "hold same for the benefit of the partnership" and "to execute all necessary deeds, bills of sale or any and all other papers for the conveyance of any and all of said assets in order to effectuate the purpose of said partnership." It is difficult to stretch an authorization to promote for the development of land and in the process to execute conveyances into an authorization for the managing partners to mortgage land without the partnership receiving the proceeds of the mortgage or into an authorization for the managing partners to make unsecured loans to themselves, *Restatement (Second), Agency* § 37, particularly without advising the limited partners of their intent to do so.

The answer to the argument of appellees that appellant knew of or later acquiesced in the conduct of the partnership is that the testimony refutes it. There is nothing to show that appellant anticipated or contemplated (or should have) that the partnership would in effect itself install utilities and build houses. There is much evidence to the contrary. The claim of acquiescence is based on the fact that appellant's husband saw a financial statement of the partnership as of April 30, 1960, which showed "loans receivable" of $154,114.58 and "loans payable" of $42,157.00 (asserted to be "clear evidence that the partnership was funding the building corporations"), and the fact that the husband attended a meeting of all the partners in January 1961 and, after learning that the managing partners had done all the things they had, took no action. The husband testified that if he saw the statement he did not understand from it that the general partners were borrowing money from the partnership and that he probably paid no attention to it and filed it. (The statement showed a partnership profit of some $54,000.)

The husband's reaction to the disclosures at the partners' meeting was neither to praise nor condemn but to make a resume, to be verified by the general partners, for subsequent deliberate consideration. On July 6, 1961, the husband wrote a letter to the general partners returning an extension agreement of the partnership for one year from March 10, 1961, as requested by them, signed by the appellant. (The other limited partners had previously done so and it would appear, in addition, ratified and confirmed the prior acts and dealings of the general partners and the partnership.) The letter said:

> "It is to be clearly understood, however, that in signing said extension agreement Mrs. Allen does not ratify or confirm any of your acts done in the name of the partnership prior to March 10, 1961; but reserves the right to take any legal action for damages and losses she may sustain as a limited partner of Belle Farms Estates because of any act of the general partners or any of them which was done without authority or in violation of any representations to or agreements with her; and particularly because of the representations contained in a letter from Reuben H. Steinberg to me dated April 14, 1959 on the basis of which Mrs. Allen invested in said partnership venture.
>
> "It is also understood that the first knowledge that either Mrs. Allen or I had of the sale or the mortgaging of the ground rents which accrued to Belle Farms or that the land of Belle Farms had been mortgaged to K.M.K. Inc. as security for a loan advanced to Milton, was on January 31, 1961 at a meeting held at the home of Melvin Fine, Esq.
>
> "If any of the understandings or conditions above set out do not meet with your approval, you will please return the enclosed agreement. Your retaining said agreement will constitute your acceptance of the above understanding and conditions."

No answer was received. We think there was no acquiescence by appellant in the conduct of the general partners which would bar her from asserting any rights she has against them.

The case will be remanded for the taking of the testimony of the appellees to rebut if they can the prima facie case made out by appellant. If appellees cannot effect a rebuttal, the chancellor must determine which form of relief claimed by appellant is appropriate—a decree for the return of her investment and such profit as she would have been entitled to receive if the agreement had not been breached, if the ascertainment of the profit is now feasible, or the return of her investment, with interest, or damages for deceit in the formation of the contract if the evidence at the close of the case justifies such relief and it is found to be the most appropriate.

> *Decree reversed, with costs, and case remanded for further proceedings consistent with this opinion.*