## THE SERGEANT COMPANY ET AL. v. CLIFTON BUILDING CORPORATION

[No. 98, September Term, 1980.]

*Decided December 10, 1980.*

The cause was argued before THOMPSON, LOWE and COUCH, JJ.

*James R. Eyler,* with whom was *Richard P. Kidwell* on the brief, for appellants.

*Thomas B. Yewell,* with whom were *Haislip & Yewell* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

This appeal arises out of an action for breach of contract brought in the Circuit Court for Charles County by Ronald W. Pickett (Pickett) and the Clifton Building Corporation (Clifton), the appellee, against The Sergeant Company (Sergeant) and Fidelity Federal Savings & Loan Association (Fidelity), the appellants. This is the third time this action has been before this Court: on two previous occasions we affirmed, in unreported opinions, a judgment entered at trial awarding Pickett $53,450; on each occasion the Court of Appeals reversed. *See, The Sergeant Company v. Pickett,* 285 Md. 186, 401 A.2d 651 (1979); *The Sergeant Company v. Pickett,* 283 Md. 284, 388 A.2d 543 (1978). In its second opinion in this case, the Court of Appeals affirmed the judgment with respect to the liability of the appellants but, because the jury was improperly instructed concerning damages, vacated the damages award and ordered a new trial as to the amount of damages. The present appeal is from the judgment in the second trial [1] awarding Clifton $53,000 in damages against the appellants.

The facts involved were set forth in some detail in the second opinion of the Court of Appeals, *see, The Sergeant Company v. Pickett,* 285 Md. at 195-203; for our present

---

[1] There had been only one trial prior to the one now under consideration.

purposes a very brief recitation of the facts will be sufficient. Pickett planned to build houses in a development in Charles County to be known as "Clifton on the Potomac." In December, 1974, he approached Sergeant, a subsidiary of Fidelity, seeking to obtain a source of permanent financing for the prospective buyers of the houses which he planned to build. By an agreement executed on January 14, 1975, it was agreed that Sergeant would use its best efforts to procure such financing: on January 24, 1975, Sergeant advised Pickett that Fidelity had obtained and would make available to Pickett some $485,000 in "special forward" money.[2] This commitment was for a period of one year. Pickett formed Clifton, the entity which contracted for and built the houses in the development, in May or June, 1975; however, due to difficulties in obtaining building permits and an injury suffered by Pickett in an accident, actual construction was delayed until September, 1975. In September, thirteen buyers signed sales contracts for homes in Clifton on the Potomac. Pickett testified that when the thirteen contracts were presented to Sergeant, Sergeant told him that the special forward money had been withdrawn. Due to the withdrawal of the low-interest mortgage financing, nine of the thirteen home-buyers refused to complete the sale. The four buyers who chose to buy the houses despite the unavailability of low-interest financing were forced to borrow money at substantially higher interest rates. Pickett testified that, in order to induce the buyers to do this, he was forced to pay the closing costs and fees normally assumed by the buyers. Pickett testified that these costs and fees totalled $1,200 on each house, thus he claimed that, as a result of the appellants' breach of their loan commitment, he lost $1,200 on each of the four houses for which the buyers were willing to accept alternative financing.

---

2. Apparently, "special forward" money is low-interest mortgage financing available to prospective home buyers who meet certain eligibility requirements through the Government National Mortgage Association, Federal National Mortgage Association, or the Federal Home Loan Mortgage Association.

As for the nine buyers who rescinded their contracts when informed that the promised financing was unavailable, Pickett testified that this resulted in lost profits of $5,000 on each house. Pickett arrived at this figure by computing the cost to build each house and subtracting that figure from the price at which he had contracted to sell the house. Thus, he claimed losses of $1,200 on each of the four houses where the buyers did not rescind, losses of $5,000 on each of the nine houses where the buyers did rescind, and, in addition, a loss of $4,850 in fees paid to the appellants for the commitment which was withdrawn. The jury awarded damages in the amount of $53,000.

## I

The appellant's first contention is that, while the previous trial resulted in a determination that the appellants were liable to Pickett, testimony at the second trial showed that the damages caused by the appellants' breach were suffered by Clifton, the corporation owned by Pickett. The court below, at the conclusion of the second trial, resolved this situation by instructing the jury that its verdict should be in favor of Clifton, rather than Pickett. The appellants contend that the court should have granted their motion for a directed verdict.

The suit was initially filed by Pickett individually. Prior to the first trial, Clifton was added as a party plaintiff. Apparently, all concerned lost sight of the fact that there were two plaintiffs, for, at the conclusion of the first trial, the jury was instructed that its verdict should be for either the plaintiff or the defendants, after which, as recorded in the transcript, "the jury returned to the courtroom and announced its verdict in favor of the plaintiff in the amount of $53,450; and on the cross-claim in favor of the Defendant." [3] The docket entry is as follows:

"*Verdict of the Jury: On the Original Case* the Jury

3. The appellants had filed a counter-claim against Pickett for fees said to be owed for the commitment of the special forward money.

found in favor of the plff. Ronald W. Pickett and against the Defts., Sergeant Co. & Fidelity Federal Savings & Loan Association & assessed damages in the amount of $53,450.00. *On the Counter-claim* the Jury found in favor of the Counter-Deft. Ronald W. Pickett & against the Counter Plff. The Sergeant Co."

When the present contention was raised below, the trial judge stated:

"The Court: Well, Clifton was a party to the proceeding. I concede that reviewing the transcript that apparently the matter was not submitted in that form to the jury but it is obvious from the testimony that Mr. Pickett, who was the sole owner of Clifton, was a Plaintiff, no judgment was entered in favor of the Defendant against the Plaintiff, Clifton, and we feel that the issue should be submitted to the jury on the question of damages.

"It seems obvious that this was a mistake in the entry of the judgment in favor of the Plaintiff, Pickett, who, that is all the evidence shows, was not the party who in fact built the houses, which were the subject of the loss, which was occasioned by the breach of the contract."

He then instructed the jury as follows:

"The Court: Members of the jury, as previously told by the Court, the matter of liability is not an issue in this case. We are dealing with the issue of damages.

"Now there are two Plaintiffs in this proceeding, Ronald W. Pickett and Clifton Building Corporation.

"Now the Court is going to instruct you that at this stage there, and it has been agreed by counsel representing the Plaintiffs, Ronald W. Pickett and Clifton Building Corporation that the verdict

should be in the name of Clifton Building Corporation, so the verdict, which you rendered in this case, will go in favor of that Plaintiff, it having been concluded that they were the, or that corporation was the one who sustained any loss that you find to have been sustained as a result of the evidence which had been admitted here today."

We think that the action of the trial judge, which amounted to a reformation of the verdict returned at the first trial, was entirely proper. In *Montgomery Ward & Co. v. Keulemans,* 275 Md. 441, 446-47, 340 A.2d 705 (1975), the Court, confronted with a somewhat similar situation, stated:

"An examination of the record makes it clear that the verdict of $1,350.00 entered on the false arrest count consisted of two elements: $1,000.00 for salary at $200.00 a week which Keulemans lost as a result of his suspension for five weeks while awaiting trial, and the $350.00 fee paid by Keulemans to defend him in the shoplifting case. Hence, the $350.00 fee was only recoverable in the malicious prosecution case.

"The trial court recognized this, and cited it as a reason for the denial of the defendants' motion for a judgment n.o.v., made before judgment absolute was entered. It would have been appropriate at this juncture for the trial court to have reformed the verdict by transferring the $350.00 award from the false arrest count to the malicious prosecution count. We see no reason why this cannot be accomplished on remand.

"The defendants argue that the defect in the verdict may only be corrected by the jury, or by the court, in the jury's presence. Alternatively, they argue that there was no effort made by the court here to correct the verdict. On the first point, they would be right, if the verdict were fatally defective, as, for example, would be a verdict which fails to assess damages. Such was the situation in *Gaither*

*v. Wilmer, supra,* 71 Md. at 364. However, we find their argument on the second point unpersuasive, because we are satisfied that it is not too late to reform the verdict in this case."

*See also, Traylor v. Grafton,* 273 Md. 649, 683, 332 A.2d 651 (1975); *Davis v. Board of Education,* 168 Md. 74, 78-79, 176 A. 878 (1935); *Sun Cab Co. v. Walston,* 15 Md. App. 113, 161-62, 289 A.2d 804 (1972), *aff'd in part* 267 Md. 559, 298 A.2d 391 (1973).

## II

To show the damages suffered by Clifton as the result of the appellants' breach, Pickett testified concerning the costs incurred by Clifton in constructing four of the houses built in the development from a memorandum which he had prepared, listing the average cost for each of the components of the four houses. The information contained in the memorandum had been extracted by Pickett from the corporation's checkbooks; apparently the memorandum was a rough list or compilation of those checks which had been written to pay for work and materials which had gone into the four houses. On cross-examination, Pickett indicated that he had with him only his "extractions from the checkbooks" and that the actual checkbooks had not been brought to court. The appellants moved to strike Pickett's testimony on the grounds that permitting him to testify concerning Clifton's costs, as recorded in the corporation's checkbooks, without the production of the checkbooks, violated the best evidence rule; they renew this contention on appeal.

We are of the opinion that the testimony of Pickett, summarizing the contents of the checkbooks, was properly admissible, as within the discretion of the trial court. 4 Wigmore, *Evidence,* § 1230 (Chadbourn rev. 1972) states:

"Where a fact could be ascertained only by the inspection of a large number of documents made up of very *numerous* detailed statements — as, the net

balance resulting from a year's vouchers of a treasurer or a year's accounts in a bank ledger — it is obvious that it would often be practically out of the question to apply the present principle by requiring the production of the entire mass of documents and entries to be perused by the jury or read aloud to them. The convenience of trials demands that other evidence be allowed to be offered, in the shape of the testimony of a competent witness who has perused the entire mass and will state summarily the net result. Such a practice is well established to be proper.

"Most courts require, as a condition, that the mass thus summarily testified to shall, if the occasion seems to require it, be placed at hand in court, or at least be made accessible to the opposing party, in order that the correctness of the evidence may be tested by inspection if desired, or that the material for cross-examination may be available. . ."

\* \* \*

"The most commonly recognized application of this principle is that by which the state of *pecuniary accounts* or other business transactions is allowed to be shown by a witness' schedule or summary. So, also in trying an issue of *infringement of copyright,* the material passages may be culled from the entire volume and presented in such a way as to be conveniently compared. Upon the same principle, summaries of *official* or *corporate* records might be presented; and testimony, by one who has examined records, that *no record* of a specific tenor is there contained is receivable instead of producing the entire mass for perusal in the courtroom." (emphasis in original). (footnotes omitted). *Id.* at 535-46.

The principle discussed by *Wigmore* has been recognized by the Maryland courts. In *Smith v. Jones,* 236 Md. 305, 309-10, 203 A.2d 865 (1964), it was stated that

"[s]ummaries or compilations made from such records may be admissible, when a proper foundation has been laid by a qualified witness on the stand." In *O'Donnell v. State,* 188 Md. 693, 697, 53 A.2d 688 (1947), the Court said: "It has been held by this Court that where the books from which certain items are desired to be offered in evidence are large records, a compilation properly made from those records is admissible." *Accord, Queen v. State,* 26 Md. App. 222, 337 A.2d 199 (1975); *Goodman v. State,* 2 Md. App. 473, 235 A.2d 560 (1967). *But see, Glen Alden v. Duvall,* 240 Md. 405, 427, 215 A.2d 155 (1965).

The appellants claim support for their argument that Pickett's testimony violated the best evidence rule in *General Builders v. MacArthur,* 228 Md. 320, 179 A.2d 868 (1962). There an objection was made, on the basis of the best evidence rule, "to the admissibility of an exhibit purporting to be an itemized list . . . of the cancelled checks given in connection with the completion of the dwelling by the owner." *Id.* at 327. This list of checks was part of the owner's proof of the damages which he had suffered as the result of the builder's breach of contract. Although the appellee in the instant case chose to merely debate the accuracy of the appellants' account of the facts in *General Builders,* rather than discussing the legal principles involved, we believe that the case provides at least some support for the appellee's position. The Court held that the rule had not been violated, thus at least implicitly sanctioning the use of a compilation or list of checks to prove the damages suffered as the result of a contract breach.

We also find instructive the opinion of the District of Columbia Court of Appeals in *R.S. Willard Co. v. Columbia Van Lines Moving & Storage Co.,* 253 A.2d 454 (D.C. 1969). There a loading door on the plaintiff's warehouse was damaged by the defendant's truck, rendering it unusable for a period of time and making access to the warehouse considerably more difficult. The plaintiff claimed, as an item of damages, the additional labor costs which had resulted from its having to use other doors for loading and unloading. The plaintiff proved these additional costs through the

testimony of its manager, who computed the expenses from the employee time sheets and payroll records, which showed an increased payroll during the time that the door was unusable. Neither the time sheets, which were present in court, nor the payroll records, which were not present, were introduced into evidence. On appeal, it was argued that the manager's testimony should have been excluded because it violated the best evidence rule. The D.C. Court rejected this argument, stating:

> " 'The best-evidence rule is not always an inflexible and unyielding one. A reasonable discretion is vested in the trial court in the application of the rule.' This court has recognized that a witness may be allowed to give an abstract or summary from voluminous records if the source material is available to the other party. Perhaps the time sheets here for the eight-week period were not so voluminous, but they must have constituted numerous pages. It should be remembered that the witness was testifying to the 'average' payroll for the weeks in question and not to the exact amount. The time sheets were in court and were available to appellant's counsel if he questioned the accuracy of the witness' calculations. We think the trial court was well within its discretion in allowing the testimony." (footnotes omitted). *Id.* at 456-57.

It is generally required that the documents to be summarized be made accessible to the opposing party and that notice be given of the proponent's intention to use such a summary. *See,* Annot., 80 A.L.R. 3d 405 (1977). In the case at bar, the appellants were fully advised as to the facts which Clifton intended to prove and in the manner in which it intended to prove them. Similar testimony had been offered at the first trial and the appellants had taken Pickett's deposition. In view of the obvious impracticality of requiring the jury members to go through all of Clifton's checkbooks and ascertain for themselves the costs of these houses, and inasmuch as we see no injustice resulting from the

admission by the trial court of Pickett's testimony, we find that, *under the circumstances of this case,* the court did not abuse its discretion in admitting this evidence.

### III

As we noted above, Clifton claimed that, as the result of the appellants' breach of its loan commitment, nine buyers rescinded their contracts with Clifton, causing the corporation to lose an expected profit of $5,000 on each of the nine houses. The appellants challenge the award of damages for the lost profits on two grounds.

The appellants first argue that Clifton failed to prove that the breach of contract was the cause of any loss of profits. They contend that, although nine of the thirteen buyers with whom Clifton had contracts at the time of the breach rescinded their contracts as the result of that breach, Clifton suffered no loss because it eventually built and sold a total of thirteen houses, thus placing it in the same position it would have occupied had the appellants not withdrawn their loan commitment. The evidence adduced at trial showed that, at the time of the breach, Clifton had the resources and the intention to build considerably more than thirteen houses in the development. Had the appellants not breached, Clifton would have retained the nine buyers who rescinded and the nine buyers who bought during the following year. Thus, but for the appellants' breach, Clifton would have sold at least twenty-two houses, not thirteen. We stated in *Dialist Co. v. Pulford,* 42 Md. App. 173, 179, 399 A.2d 1374 that "the measure of damages for a breach of contract is that sum which would put plaintiff in as good a position as he would have occupied had the contract been fully performed . . ." and that "[s]uch sum is usually the amount of profit which would have been derived from the agreement had no breach occurred." *See, M & R Builders v. Michael,* 215 Md. 340, 138 A.2d 350 (1958). Here, awarding Clifton the profits it would have received from the nine sales which it lost places it in the position it would have occupied had the appellants not breached their contract. The appellants' contention is without merit.

The appellants also assert that "Clifton was not an established business which had been operating for a sufficient length of time to afford a basis for some degree of certainty as to the loss of profits." In *John D. Copanos & Sons v. McDade Rig.,* 43 Md. App. 204, 208, 403 A.2d 402, *cert. denied,* 286 Md. 750 (1979), this Court stated: "The real concern in considering lost profits as an element of damages is not whether the business is old or new, but rather whether anticipated profits can be shown with reasonable certainty so that the evidence rises above speculation or conjecture." In *Copanos,* a drug manufacturer sought to recover profits lost as the result of the destruction of a machine which was to have been used to produce a particular drug. Because the machine had not yet been placed in production, the trial court held that the profits anticipated from the use of the machine could not be proven with reasonable certainty and refused to permit the manufacturer to present evidence of lost profits. We reversed, holding that the evidence proffered by the manufacturer was sufficient for it to reach the jury on the question of lost profits. In its proffer, the manufacturer indicated that it would present evidence that it had contracts for the sale of the drug which was to have been manufactured with the machine and those contracts were cancelled by the buyers after the destruction of the machine; that it would establish its cost to produce the drug; and, that it would establish the price at which the drug was to have been sold under the contracts. *Id.* at 209.

We see no significant difference between the proffer which we held sufficient in *Copanos* and the evidence which Clifton presented at trial. Clifton proved that it had contracts for the sale of thirteen houses and that, as the result of the appellants' breach, nine of the contracts were cancelled; it proved its costs in building the houses; and, it proved the price at which it would have sold the houses under the contracts which were rescinded. These facts were proven through the testimony of Pickett, who had considerable experience in real estate development and who had been a builder of single family homes since 1969. The law requires no more certainty than this. Reasonable certainty is all that

is required. *See, Impala Platinum v. Impala Sales,* 283 Md. 296, 330-33, 389 A.2d 887 (1978); *M & R Builders v. Michael, supra; GAI Audio of New York v. C.B.S.,* 27 Md. App. 172, 200, 340 A.2d 736 (1975).

*Judgment affirmed.*
*Appellants to pay the costs.*