915 F.2d 1564
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
EDWARDS FAMILY LIMITED PARTNERSHIP, Plaintiff-Appellee,
v.
Milton A. BARLOW, Ian Corporation, Phoenix Apartments, Inc.,
formerly known as Willoughby Apartments, Inc., The
Barlow Corporation, Defendants-Appellants.
 No. 89-2715.
 United States Court of Appeals, Fourth Circuit.
 Argued May 7, 1990.
Decided Oct. 12, 1990.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Paul V. Niemeyer, District Judge. (CA-86-2974-PN)
 Dale Andrew Cooter, Cooter & Gell, Washington, D.C. (Argued), for appellee; James E. Tompert, Cooter & Gell, Washington, D.C., on brief. David Newton Webster, Caplin & Drysdale, Chartered, Washington, D.C. (Argued), for appellants; Sally A. Regal, James Sottile, IV, Caplin & Drysdale, Chartered, Washington, D.C., on brief.
 D.Md.
 REVERSED AND REMANDED.
 Before PHILLIPS and MURNAGHAN, Circuit Judges, and EDWARD S. SMITH, Senior Judge, United States Court of Appeals for the Federal Circuit, sitting by designation.
 PHILLIPS, Circuit Judge:
 
 
 1
 Milton Barlow and various corporate entities controlled by him[1] appeal the district court's entry of judgment for plaintiff/appellee Edwards Family Limited Partnership (EFLP) following a jury verdict holding the defendants liable for breach of fiduciary duty in connection with their management of certain real estate development projects. Barlow contends that the district court erred in refusing a requested jury instruction on the breach of fiduciary duty claim and in permitting the jury to award damages for "lost profits," appraised land values, and certain development costs. We agree with Barlow that the district court erred in refusing his requested instruction, and we remand for a new trial.
 
 
 2
 * Defendants/appellants IAN Corporation (IAN) and Phoenix Apartments, Inc.,[2] were general partners in two limited partnerships formed to develop parcels of land in a Montgomery County, Maryland, special taxing district for commercial development. IAN was the general partner in one of these limited partnerships, One Park North Associates (OPNA), and Phoenix Apartments was the general partner in the other, Forty-Four Associates (FFA). In 1978, EFLP, a limited partnership comprising Thelma Edwards and her children, entered into an agreement with IAN whereby EFLP would convey its interests in two parcels of land, Lots 4 and 5, to OPNA for development of a "multi-story office retail apartment complex." The agreement provided that EFLP would be a limited partner, with a one-third interest, in OPNA. IAN, as developer and managing general partner, built only one small office building, completed in 1980, on Lot 4 and left the other parcel, Lot 5, undeveloped. IAN did not lease the building to capacity and finally sold it in 1985. Out of the proceeds of the sale, $3,000,000 went to repay a loan that general partner IAN had made to OPNA, and $4,650,000 went to IAN for interest payments on that loan. EFLP received $750,000 of the $2,250,000 profit distribution, the balance going to IAN. It is undisputed that OPNA still owns the undeveloped Lot 5, and thus that EFLP still owns its one-third interest in that lot.
 
 
 3
 In 1983, Barlow and Edwards formed FFA to acquire and sell a parcel of land known as Lot 44. As noted above, Phoenix Apartments was general partner in FFA; EFLP was a limited partner with a one-fourth interest. At some point not long after FFA's formation, Edwards (as EFLP) refused to enter into further agreements to develop Lot 44 and urged Barlow (as Phoenix Apartments) to sell the property. Barlow did not do so and instead incurred substantial costs, paid by FFA, relating to development of the property. It is undisputed that FFA still owns Lot 44, and thus that EFLP still owns its interest in that lot.
 
 
 4
 In 1986, Barlow sent notice to Edwards that he was dissolving FFA, and in 1987 he sent her notice that he was dissolving OPNA.
 
 
 5
 In September 1986, EFLP sued Barlow and the other defendants alleging violations of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. Secs. 1961 et seq., and state law claims of fraud, breach of contract, breach of fiduciary duty, accounting, and injunctive relief.[3] EFLP prayed for treble damages and attorney's fees under RICO and compensatory and punitive damages under state law. On the claims relating to OPNA, EFLP sought to recover damages for (1) its share of "lost profits" resulting from Barlow's failure to develop parcels 4 and 5 into a high-rise condominium complex and (2) the interest OPNA paid on the loan from its general partner, IAN. On the claims relating to FFA, EFLP sought damages for development costs that the limited partnership incurred.
 
 
 6
 At trial, EFLP's evidence of lost profits on the OPNA venture came in the form of the testimony of two experts: Lawrence Ponsford, an urban planning expert who testified that the best use of the parcels would have been a mix of luxury condominiums and retail space, and Edward Heiden, a Ph.D. economist who, using a nearby development as a benchmark, relied on sophisticated economic models to calculate the probable lost profits. Heiden testified that the lost profits exceeded $11 million. EFLP adduced no evidence that the construction had begun on the contemplated venture, nor that plans, blueprints, or cost projections for the project had been drafted.
 
 
 7
 After a trial lasting several weeks, the district court directed a verdict in favor of Barlow on the fraud and punitive damages claims and submitted the other claims to the jury. Because the OPNA and FFA partnership agreements limited the general partner's liability to cases of "actual fraud, gross negligence or dishonest conduct," Barlow requested a jury instruction on the breach of fiduciary duty claim that incorporated that limitation. The district court rejected the request and instead read a standard instruction on fiduciary duties under Maryland law.
 
 
 8
 The jury rejected all of EFLP's other claims except the one for breach of fiduciary duty. The special verdict form awarded damages equal to "$2,500,000 + 33 1/3% appraised land value" on the claims relating to OPNA and "$285,000 + 25% of appraised land value" on the claims relating to Lot 44. The jury's initial verdict thus awarded damages for the appraised value of Lots 5 and 44, even though EFLP still owned its partnership interests in those lots. After hearing counsels' arguments on how, if at all, to correct the jury's apparent misperception that EFLP was entitled to recover its share of the lots' value, the district court instructed the jury to reconsider the evidence in the case and return with a specific dollar figure for damages on the two claims. The jury returned twenty minutes later with verdicts for damages of $3,937,536 on the OPNA claims and $1,318,250 on the FFA claims. The dollar figure for damages awarded on the FFA claims, $1,318,250, equalled $285,000 plus one-fourth of the value assigned Lot 44 by the appraiser who testified for EFLP; the damages on the OPNA claim, $3,937,536, equalled $2,500,000 plus one-third of the alternative amount the appraiser assigned to Lot 44.
 
 
 9
 Barlow moved for j.n.o.v., a new trial, and/or remittiture, arguing the same points that he now raises on this appeal. First, he claimed that the court should have given a requested jury instruction that incorporated a contractual limitation of liability. Second, the court erred in failing to ensure that the jury verdict did not include recovery for appraised land values. Third, he claimed that there was no evidence that EFLP suffered any loss from FFA's development expenditures. Finally, he challenged the court's decision to permit the jury to award lost profits. The district court denied all the motions, with the exception that it reduced the $285,000 portion of the damages on the FFA claims to $49,992, a figure representing exactly one-fourth of what the court saw as identifiable development costs incurred by FFA. Barlow now appeals the denials of those motions. EFLP has taken no cross-appeals.
 
 II
 
 10
 We address first Barlow's challenge to the jury instruction, then discuss briefly our view of the damages issues as they appear in the case's current posture.
 
 
 11
 * Barlow contends that the district court erred in instructing the jury on the breach of fiduciary duty claim because the instruction did not incorporate a contractual limitation of liability for losses not resulting from "actual fraud, gross negligence, or dishonest conduct." We agree with Barlow that the failure to give this instruction was reversible error.
 
 
 12
 The OPNA and FFA partnerships agreements contained the following limitation on a partner's liability for losses to the partnership:
 
 
 13
 No partner shall be liable to any other partners or to the partnership by reason of the actions of such partner in connection with the partnership, except in the case of actual fraud, gross negligence or dishonest conduct, and except by reason of the failure of a partner to perform any express obligations imposed upon such partner by any provisions of this Agreement.
 
 
 14
 Barlow requested the following instruction based on the contractual limitation:
 
 
 15
 In this case the parties have entered into a written agreement that provides that defendants are not liable to [EFLP] except in the case of actual fraud, gross negligence or dishonest conduct with respect to the partnership property or except by reason of the failure of a partner to perform any express obligations imposed upon that partner by any provisions of the agreement. Thus, before you may impose any liability upon the defendants for breach of contract or breach of fiduciary duty for their handling of partnership business or property you must find that their conduct was marked by actual fraud, gross negligence or dishonest conduct or by reason of the failure to perform an express obligation imposed by the written agreement.
 
 
 16
 J.A. at 130. The district court rejected this instruction and instead read a standard breach of fiduciary duty instruction, substantially based on Allen v. Steinberg, 223 A.2d 240, 246 (Md.1966), the leading Maryland case on the fiduciary obligations of partners to each other. The instruction stated:
 
 
 17
 A partnership is a fiduciary relationship and co-partners owe to one another the highest duty of loyalty imposed by law. A fiduciary duty requires the utmost good faith and loyalty between the partners and an obligation to make full disclosure of all known information that is significant and material to the partnership.
 
 
 18
 The principle of utmost good faith and full disclosure covers not only dealings and transactions occurring during the partnership but, also those taking place during the negotiations prior to the formation of the partnership.
 
 
 19
 A partner has a fiduciary relationship to his partner. This means he must carry out his assignment in good faith. He must make a full disclosure to his partner of all facts that serve as part of his decision, to accept or reject the proposed transaction, and to act with care, skill, and diligence, for the sole benefit of his partner.
 
 
 20
 A general partner owes to its limited partners the same duty as imposed by the fiduciary relationship between general partners.
 
 
 21
 J.A. at 436-37.
 
 
 22
 The district court did not base its refusal to give Barlow's requested instruction on a ruling that the exculpatory clause in the partnership agreements was unenforceable. Rather, the court thought the instruction "too fact specific," focusing attention on one part of the contract to the exclusion of other applicable parts. The court stated that as a fiduciary, Barlow owed a tort duty--independent of the contract--to deal honestly with EFLP and that this duty was not inconsistent with the limitation in the contract. Though it rejected the proposed instruction, the court stated that it would permit Barlow to argue to the jury whatever provisions of the contract might bear on the claimed breach of fiduciary duty. Perceiving no necessary conflict between the contractual provision and the instruction it read, the court reasoned that a jury finding of "dishonest conduct," which the contract did not exculpate, would constitute a breach of fiduciary duty. The court stated:
 
 
 23
 A breach of the fiduciary duty is not necessarily inconsistent with the contractual limitations that had been agreed upon by the parties. This was something for the jury to determine. If, for instance, the defendants as general partners engaged in deliberate self-dealing, at the expense of limited partners, dishonest conduct could be found, and defendants would be liable under fiduciary law, which liability would not be limited by contract.
 
 
 24
 The court found that there was indeed evidence from which the jury could have found dishonest conduct. Assuming, then, that the jury had in fact found dishonest conduct, the court opined that any possible error in its refusal to give the requested instruction was not prejudicial:
 
 
 25
 The refusal of the Court to highlight one portion of the contract over another was not error and more importantly was not prejudicial. If the jury were convinced, as apparently they were, that the defendants were guilty of a breach of fiduciary duty in their self-dealing, such liability need not be protected by the contractual limitation.
 
 
 26
 Barlow argues on appeal that the standard breach of fiduciary duty instruction read by the court would have permitted the jury to find liability on that claim based on a lower degree of scienter than required by the contractual limitation. The jury may, for instance, have believed that Barlow was simply negligent. Such a finding could subject him to liability under the court's instruction on breach of fiduciary duty, but would not be a legal basis for liability under the contractual limitation, assuming its enforceability.
 
 
 27
 We agree with Barlow that the Maryland courts would enforce the exculpatory clause at issue here. In Sullivan v. Mosner, 295 A.2d 482 (Md.1972), the Maryland Court of Appeals enforced an exculpatory clause to the extent that it limited a trustee's liability for breach of fiduciary duty to acts committed in bad faith, intentionally, or recklessly. In Sullivan, a husband and wife sued an attorney for violating the terms of a trust agreement authorizing him to disburse to a builder construction loan funds held in trust. Because the Court of Appeals found that the chancellor had erred in ruling that the attorney had not violated the trust agreement, the court had to address directly the legal effect of a broad exculpatory clause limiting the trustee's liability. The court rejected the plaintiffs-appellants' argument that the clause "connotes no remedy for breach of duty, and is against public policy." Id. at 490. Adopting and quoting from the Restatement (Second), Trusts Sec. 222, the court held that the exculpatory clause in the case was effective to protect the trustee from all liability except that resulting from "an act 'committed in bad faith or intentionally or with reckless indifference to the interest of the beneficiary.' " Sullivan, 295 A.2d at 491. The court found no evidence that the trustee abused the settlor's trust in placing the exculpatory clause in the agreement (a circumstance that would invalidate the clause under the Restatement approach), nor any evidence that the breach was committed in bad faith, intentionally, or recklessly. Accordingly, the Court of Appeals held that the attorney was not liable on the claim for breach of fiduciary duty because the particular breach in the case was legally barred by the trust agreement.
 
 
 28
 The Maryland courts would give the same legal effect to an exculpatory clause in a partnership agreement that the Sullivan court gave to the trustee exculpatory clause. Under Maryland law, as generally, a partner owes the same fiduciary obligations to other partners that a trustee owes to a cestui que trust. Allen v. Steinberg, 223 A.2d 240 (Md.1966) (discussing fiduciary duties of managing general partner in context of real estate development partnership). Moreover, the Maryland legislature has recognized that general partners may limit the circumstances under which they will be liable to other partners and to the partnership, though they may not limit liability to outsiders. See Ann. Code Md. Sec. 10-403 ("A general partner may not limit the general partner's liability in the partnership agreement to persons other than his partners or the partnership."); cf. id. Sec. 10-107 ("Except in the case of action or failure to act by a partner which constitutes willful misconduct or recklessness, ... a limited partnership has the power to indemnify and hold harmless any partner, employee, or agent of the limited partnership from and against any and all claims and demands whatsoever.").
 
 
 29
 We think it clear that the contractual limitations on the OPNA and FFA partners' liability to each other are valid and enforceable under Maryland law. Though the district court stated basis for liability under the contractual limitation, assuming its enforceability.
 
 
 30
 We agree with Barlow that the Maryland courts would enforce the exculpatory clause at issue here. In Sullivan v. Mosner, 295 A.2d 482 (Md.1972), the Maryland Court of Appeals enforced an exculpatory clause to the extent that it limited a trustee's liability for breach of fiduciary duty to acts committed in bad faith, intentionally, or recklessly. In Sullivan, a husband and wife sued an attorney for violating the terms of a trust agreement authorizing him to disburse to a builder construction loan funds held in trust. Because the Court of Appeals found that the chancellor had erred in ruling that the attorney had not violated the trust agreement, the court had to address directly the legal effect of a broad exculpatory clause limiting the trustee's liability. The court rejected the plaintiffs-appellants' argument that the clause "connotes no remedy for breach of duty, and is against public policy." Id. at 490. Adopting and quoting from the Restatement (Second), Trusts Sec. 222, the court held that the exculpatory clause in the case was effective to protect the trustee from all liability except that resulting from "an act 'committed in bad faith or intentionally or with reckless indifference to the interest of the beneficiary.' " Sullivan, 295 A.2d at 491. The court found no evidence that the trustee abused the settlor's trust in placing the exculpatory clause in the agreement (a circumstance that would invalidate the clause under the Restatement approach), nor any evidence that the breach was committed in bad faith, intentionally, or recklessly. Accordingly, the Court of Appeals held that the attorney was not liable on the claim for breach of fiduciary duty because the particular breach in the case was legally barred by the trust agreement.
 
 
 31
 The Maryland courts would give the same legal effect to an exculpatory clause in a partnership agreement that the Sullivan court gave to the trustee exculpatory clause. Under Maryland law, as generally, a partner owes the same fiduciary obligations to other partners that a trustee owes to a cestui que trust. Allen v. Steinberg, 223 A.2d 240 (Md.1966) (discussing fiduciary duties of managing general partner in context of real estate development partnership). Moreover, the Maryland legislature has recognized that general partners may limit the circumstances under which they will be liable to other partners and to the partnership, though they may not limit liability to outsiders. See Ann. Code Md. Sec. 10-403 ("A general partner may not limit the general partner's liability in the partnership agreement to persons other than his partners or the partnership."); cf. id. Sec. 10-107 ("Except in the case of action or failure to act by a partner which constitutes willful misconduct or recklessness, ... a limited partnership has the power to indemnify and hold harmless any partner, employee, or agent of the limited partnership from and against any and all claims and demands whatsoever.").
 
 
 32
 We think it clear that the contractual limitations on the OPNA and FFA partners' liability to each other are valid and enforceable under Maryland law. Though the district court stated that it was not holding the clause unenforceable, its refusal to instruct the jury along the lines requested by Barlow--thus leaving to the jury the question of what significance, if any, to attach to the clause--had practically the same effect as such a holding. The interpretation of a contract is a legal, not factual, question. It was for the court to decide the legal question of the clause's enforceability and then to instruct the jury correctly on the circumstances under which Maryland law would permit liability in this case. See generally 9 C. Wright & A. Miller, Federal Practice and Procedure: Civil Sec. 2556, at 654 (1971) ("It is the inescapable duty of the trial judge to instruct the jurors, fully and correctly, on the applicable law of the case, and to guide, direct, and assist them toward an intelligent understanding of the legal and factual issues involved in their search for truth.") (citing cases). Sullivan indicates that the Maryland courts would not let stand a judgment against the fiduciary founded solely on conduct of the sort validly exculpated in the clause. In this case, Barlow properly objected to and raised on appeal this legal defect in the instructions; but we have even held that it can be plain error, requiring reversal, for a district court not to instruct on a factual or legal theory that bears directly on liability. See Furka v. Great Lakes Dredge & Dock Co., 755 F.2d 1085, 1088, 1089 (4th Cir.1985) (plain error for court to submit question of contributory negligence to jury "without reference to the special context of rescue," a context which entitled appellant to "special instruction regarding these circumstances"); Stewart v. Hall, 770 F.2d 1267, 1270 (4th Cir.1985) (plain error for court to submit attorney malpractice action to jury without giving an instruction--though not requested by party--that it should consider the merits of the underlying action giving rise to malpractice claim because that question related to causation.). Here, the district court's refusal to instruct the jury on the potentially dispositive legal effect of the exculpatory clause amounted to a misstatement of "fundamentally controlling substantive principles governing [EFLP]'s right to recover." Miller v. Premier Corp., 608 F.2d 973, 983 (4th Cir.1979).
 
 
 33
 This error requires reversal and remand for a new trial. It is possible, as the court assumed, that the jury actually found that Barlow engaged in conduct that the contract did not insulate from liability--there appears to have been evidence of "dishonest conduct," and in any event Barlow does not contend that the evidence was insufficient to permit a properly instructed jury to find such conduct. But this record does not negate the alternative possibility that the jury simply did not believe that Barlow acted dishonestly, but believed instead that, while basically honest in his conduct, he failed to conform to the lofty standards imposed on a fiduciary. The fact that the district court directed a verdict on the fraud and punitive damages claims and that the jury rejected all the others might perhaps warrant skepticism about whether this jury actually found dishonest conduct. In any event, there is "no way to know that the invalid claim [of conduct amounting to an honest breach] was not the sole basis for the verdict," and therefore a remand for a new trial is necessary. United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki, 358 U.S. 613, 619 (1959).
 
 B
 
 34
 Our disposition of the liability issue affects our treatment of the damages issues that Barlow raises. On remand, the district court must reconsider damages because it does not "clearly appear[ ] that the issue to be retried [liability] is so distinct and separable from the others [damages] that a trial of it alone may be had without injustice." Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 500 (1931). See generally 11 C. Wright & A. Miller, Federal Practice and Procedure: Civil Sec. 2814. We cannot say with certainty that a jury required to find dishonest conduct or the like would find that the same damages awarded here flowed from that specific conduct.
 
 
 35
 Barlow, however, argues that we should limit the elements of damages that may be considered on retrial. Specifically, Barlow contends that because the impermissible damages component of appraised land values for Lots 5 and 44 is an identifiable figure, we should either strike that amount from the judgment or, in the alternative, preclude their recovery on remand. As we explain below, we find it unnecessary to address this argument.
 
 
 36
 He also contends that we should limit the new trial order to consideration of the questions of liability only for the OPNA claim and of damages on that claim flowing only from interest that IAN charged on loans to OPNA. As noted, on the OPNA claim, EFLP sought damages for improper interest charges and for lost profits. Barlow contends that the evidence of lost profits was too speculative to permit recovery of that element of damages and that we should rule that the only permissible item of damages for the OPNA claim on remand will be the allegedly improper interest charges. As we also explain below, we do not think it would be prudent for us to make such a ruling.
 
 
 37
 Finally, with respect to the FFA claim, the only item of damages EFLP sought was its share of development costs that FFA incurred, allegedly improperly. Barlow asks us to rule as a matter of law that EFLP may not recover on the FFA claim because it presented no evidence of its losses from FFA's expenditures on development. For the reasons given below, we are not prepared to so rule.
 
 
 38
 (1)
 
 
 39
 It is unnecessary to address Barlow's argument that we should strike the portion of the verdict traceable to appraised land values. Assuming a general issue of damages is submitted to the jury on remand, the district court will then have the opportunity to prevent potential jury confusion about whether EFLP should recover its share of the appraised values of Lots 5 and 44. The occurrence of this confusion suggests no error on the court's part; the transcript shows that the parties were every bit as surprised as the court when the initial special verdict form plainly indicated that the jury was awarding appraised land values as an element of damages. We express no view on the adequacy of the district court's corrective instruction stating that the jury should reconsider the question and return with a verdict in a dollar form. It suffices to say that the court and counsel on remand will have the opportunity to avoid another jury's misapprehension on this point.
 
 
 40
 (2)
 
 
 41
 We also think it would be inadvisable to address whether the court erred in permitting recovery for lost profits. Resolution of this difficult fact-bound question would necessitate careful analysis of conflicting currents in the Maryland case law, and we have concluded that it would be imprudent to hazard an analysis of this claim without knowing with certainty what evidence might be adduced on remand. Our hesitation in this regard is in part colored by the lack of clarity in the Maryland cases that have considered lost profits.
 
 
 42
 Some Maryland cases have appeared to use a fairly rigid test of the "reasonable certainty" that profits would have been made. In St. Paul at Chase Corp. v. Manufacturers Life Ins. Co., 278 A.2d 12 (Md.1971), the defendant canceled a commitment it had made for permanent financing of a proposed apartment building. Though the lender had made a valuation of the potential profits of the building, and blueprints and plans for it had been composed, the court refused to permit the plaintiff/developer to recover lost profits. The court reasoned that "[r]ealization of profits from a new untried venture such as this depends on so many uncertainties that they cannot form a proper element of damage in a contract action ..." Id. at 38. Similarly, in Evergreen Amusement Corp. v. Milstead, 112 A.2d 901 (Md.1955), the Court of Appeals held that the owner of a drive-in theater could not recover lost profits from a contractor who failed to complete construction on time, even though by the time of trial the theater was earning a profit that could conceivably have been used as a benchmark to measure damages.
 
 
 43
 On the other hand, the cases cited by the district court used language suggesting a more open-ended, functional approach to awarding lost profits. In Sergeant Co. v. Clifton Bldg. Corp., 423 A.2d 257 (Md.App.1981), a developer was allowed to recover lost profits from a lender who reneged on a commitment to provide permanent financing to prospective home buyers where the developer had already built the houses and the buyers had already signed contracts. In allowing recovery of lost profits, the Sergeant Court relied on another Court of Special Appeals case, John D. Copanos & Sons v. McDade Rigging, 403 A.2d 402 (Md.App.1979), awarding lost profits, which summarized the law on lost profits as follows: "The real concern in considering lost profits as an element of damages is not whether the business is old or new, but rather whether anticipated profits can be shown with reasonable certainty so that the evidence rises above speculation or conjecture." Id. at 405. Other cases support the proposition that there is no per se rule that start-up businesses cannot recover lost profits, if the fact that profits would have been earned, and their amount, can be proved with reasonable certainty. Impala Platinum v. Impala Sales, 389 A.2d 887, 907 (Md.1978); National Micrographics Sys. v. OCE-Indus., 465 A.2d 862, 868-69 (Md.App.1983).
 
 
 44
 On remand, the district court will have an opportunity to apply Maryland law as it finds it to new evidence, and thus we decline to express any views on this issue as it came to us.
 
 
 45
 (3)
 
 
 46
 Finally, we are not in a position to rule on the propriety of the court's permitting EFLP to recover $49,992 in development costs relating to Lot 44. EFLP argues that the recovery was proper because as a partner in FFA, EFLP is ultimately liable for one-fourth of development costs. On the other hand, EFLP has not disputed Barlow's assertion that this record contains no evidence that EFLP ever actually invested any money in the development of Lot 44, and we likewise see no such evidence. If, however, Maryland partnership law would hold EFLP, as a partner in FFA, liable for its share of these expenditures in FFA's winding up proceedings, then there may be merit to EFLP's argument that it should recover that amount, notwithstanding that it had not specifically invested funds for development. On remand, the parties should inform the district court of the status of any winding up proceedings and address what effect, if any, the outcome or likely outcome of those proceedings would have on EFLP's recovery of development costs in this action.[4]
 
 III
 
 47
 For the foregoing reasons, the judgment of the district court is reversed, and the case is remanded for proceedings not inconsistent with this opinion.
 
 
 48
 REVERSED AND REMANDED.
 
 
 49
 MURNAGHAN, Circuit Judges, and EDWARD S. SMITH, Senior Judge, joined in the opinion.
 
 
 
 [1]
 The defendants below were IAN Corporation, Phoenix Apartments, Inc., Barlow Corporation, and Milton Barlow. For convenience, we will usually refer to them collectively and individually as "Barlow," except where the context calls for more specific identification of one of the parties
 
 
 [2]
 Milton Barlow and Barlow Corporation were sued as "alter egos" of these entities
 
 
 [3]
 EFLP also unsuccessfully brought some claims, not at issue on this appeal, against an entity named Phoenix Associates
 
 
 [4]
 Our reluctance to address this issue is also motivated by the peculiar difficulties caused by the jury's initial verdict awarding appraised land values on the FFA claim. Barlow moved for remittitur on the final verdict FFA claim, arguing that it in fact included the impermissible element of appraised land values. In ruling on that motion, the district court appears to have relied on a factual premise that it had invalidated in a separate holding. The court's final damages figure on the FFA claim, after remittitur, was $1,083,242. It reached this figure by isolating the $285,000 that the initial verdict form did not attribute to appraised land value and reducing that figure to $49,992. The court reasoned that $49,992--or one-fourth of the total development costs in evidence--was "the maximum the jury could award" for development costs to EFLP. Thus, the court subtracted $285,000 from the jury's total damages awarded, then added back in $49,992. This method of course assumed that the jury's final damages award of $1,318,250 necessarily included a component of $285,000 in development costs, an assumption that was in turn based on the fact that, twenty minutes before it decided on the lump sum award, the jury had returned with a damages verdict of $285,000 plus one-fourth appraised land value. See slip op. at 13 ("Since there was no other evidence, the court is able to review the components of the verdict against the evidence presented."). As noted, however, the court sent the jury back with instruction to reconsider the entire damages question and return with a fixed dollar amount. The court's stated justification for refusing to grant j.n.o.v. after the jury came back with a verdict that plainly appeared to include appraised land values was that "the Court cannot as a general matter assume with the defendants the nature of the components in the revised jury verdict"; it noted also that "there is no doubt that the revised verdict superseded the initial verdict after the Court's instruction and further deliberation." Slip op. at 9
 As we noted in the preceding subpart, this peculiarity should not recur if the court on remand uses the benefit of hindsight to avoid the jury confusion that occurred in the first trial.